Gerraughty depo

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| ROBIN WHITE, et al. | ) | |
|     Plaintiffs, | ) | |
| | ) | Case No. C-1-01-356 |
|   vs. | ) | Judge Sandra S. Beckwith |
| | ) | Magistrate Timothy S. Hogan |
| METABOLIFE INTERNATIONAL, INC. | ) | |
|     Defendant. | ) | |

| | | |
|---|---|---|
| SHERRI COX, et al. | ) | |
|     Plaintiffs, | ) | |
| | ) | Case No. C-1-01-643 |
|   vs. | ) | Judge Sandra S. Beckwith |
| | ) | Magistrate Timothy S. Hogan |
| METABOLIFE INTERNATIONAL, INC. | ) | |
|     Defendant. | ) | |

| | | |
|---|---|---|
| CYNTHIA A. JOHNSON, et al. | ) | |
|     Plaintiffs, | ) | |
| | ) | Case No. C-1-01-676 |
|   vs. | ) | Judge Sandra S. Beckwith |
| | ) | Magistrate Timothy S. Hogan |
| METABOLIFE INTERNATIONAL, INC. | ) | |
|     Defendant. | ) | |

| | | |
|---|---|---|
| BARBARA J. BRADLEY, et al. | ) | |
|     Plaintiffs, | ) | |
| | ) | Case No. C-1-01-809 |
|   vs. | ) | Judge Sandra S. Beckwith |
| | ) | Magistrate Timothy S. Hogan |
| METABOLIFE INTERNATIONAL, INC. | ) | |
|     Defendant. | ) | |

DEPOSITION OF

ROBERT J. GERRAUGHTY, PH.D.

Taken at the Clarion Inn and Convention Center
211 Southeast Walton Boulevard
Bentonville, Arkansas 72712
April 4, 2003
8:30 a.m

Page 1

**Gerraughty depo**

- appearances continued on next page -

•

**A P P E A R A N C E S:**

**For the Plaintiffs:**                    Janet G. Abaray
                                            Attorney at Law
                                            Lopez, Hodes, Restaino,
                                              Milman, Skikos & Polos
                                            312 Walnut Street, Suite 2090
                                            Cincinnati, Ohio 45202


**For the Defendant:**                     Frederick M Erny
                                            Attorney at Law
                                            Dinsmore & Shohl, LLP
                                            1900 Chemed Center
                                            255 East Fifth Street
                                            Cincinnati, Ohio 45202


                                            Christina Marshall
                                            Attorney at Law
                                            Sutter, O'Connell,
                                              Mannion & Farchione
                                            3600 Erieview Tower
                                            1301 East 9th Street
                                            Cleveland, Ohio 44114




                    Blake Greenway
                Bentonville Court Reporting
                    2907 Northaven Drive
                Bentonville, Arkansas 72712
                    (479) 273-9199

•

Gerraughty depo

# S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between counsel for the parties hereto that the deposition testimony of Robert J. Gerraughty, Ph. D., shall be taken before Blake Greenway, certified court reporter and notary public, at the above-captioned time and place, and may, if necessary, be used as evidence in the above-captioned matters.

Said deposition is taken pursuant to the Federal Rules of Civil Procedure. Objections except as to the form of the question and responsiveness of the answer are reserved until the time of trial.

3

•

Gerraughty depo

```
 1                    P R O C E E D I N G S
 2                    (The witness was sworn.)
 3          Whereupon,
 4
 5                 ROBERT J. GERRAUGHTY, PH.D.,
 6          Having been first duly sworn, testified as follows:
 7                        DIRECT EXAMINATION
 8   BY MR. ERNY:
 9   Q      Good morning, sir.
10   A      Good morning.
11   Q      Can you state your name for the record, please?
12   A      Yes, Robert J. Gerraughty.
13   Q      What is your current address, sir?
14   A      1 Bruton Lane, (spelling) B-R-U-T-O-N Lane, Bella
15   Vista, Arkansas 72715.
16   Q      Is that an office or a home address?
17   A      That's a home address.  I have my office in my home.
18   Q      What is your date of birth, sir?
19   A      8/30/28.
20   Q      We share a birthday.
21   A      Hmm?
22   Q      We share a birthday.
23   A      Oh, do we?
24   Q      We do.
25   A      Okay.
```

4

```
 1   Q      Other than the office that you have at home, which I
```

Gerraughty depo

2      understand is your consulting business, right?

3      A      Yes, that's correct.

4      Q      Are you employed in any other capacity?

5      A      No, I'm retired in other capacities.

6      Q      How long ago did you retire?

7      A      1991, the end of 1991.

8             (Whereupon, Exhibit Number 1 was marked

9             for identification.)

10     Q      Dr. Gerraughty, I'll show you what the court

11     reporter has marked as Deposition Exhibit Number 1, and I

12     will tell you that this is the curriculum vitae, or as you

13     have set forth, the biographical data that was provided

14     with your expert report.  Is this your current CV?

15     A      There may be a few more things that I've added since

16     this was done in January of 2002, and I haven't revised it

17     recently.

18     Q      This is the current version in terms of revisions,

19     but there may have been things that you've done that you

20     haven't yet put on there?

21     A      Yes, that's correct.

22     Q      What kind of things have you done that have not made

23     it on to this?

24     A      I've done similar consulting for companies, for drug

25     companies, and I've given a lecture, I think, maybe two

                                          5

1      lectures since this, at a symposium

2      Q      What were the lectures on?

3      A      Good manufacturing practices, in general.

Gerraughty depo

4   Q       Were they good manufacturing practices as they

5   relate to pharmaceutical manufacturers?

6   A       Yes, they were.

7   Q       You previously discussed some consulting for drug

8   companies.   Have you done any consulting for any dietary

9   supplement companies?

10  A       Not since this report, but I have in the past.

11  Q       Who have you consulted for in terms of the dietary

12  supplement companies in the past?

13  A       I've consulted in Saudi Arabia for one.   I've

14  consulted for several in the United States over the years.

15  Some of them are listed on here.   Several of the companies

16  that I've consulted for have dietary supplements, but they

17  also have drugs too.

18  Q       Has your consulting with those companies concerned

19  the drug side or the dietary supplement side?

20  A       Both.

21  Q       What kind of consulting have you done for them?

22  A       Basically, review their good manufacturing practices

23  and their compliance with DSHEA.

24  Q       I'm sorry, I didn't hear that last acronym

25  A       DSHEA, Dietary Supplement Health Education Act.

6

•

1   Q       Can you point out in your CV those places that

2   you've consulted with that manufactured both drugs and

3   dietary supplements?

4   A       Yes, I'll have to look at them

Page 6

Gerraughty depo

5   Q      If you look on page 9, it lists your consultancies.

6   A      Okay.

7              MS. ABARAY:   It looks like it's page 7.

8   A      Metabolic -- well, wait a minute.  That's the

9   previous page.   Number 6 would involve a little bit of

10  that.

11  Q      Number 6, where it says, "Consultant to Government

12  of India on pharmaceutical formulation, formularies and

13  drug regulation?"

14  A      Yes.

15  Q      In 1962 and 1963?

16  A      Yes.

17  Q      And it's your testimony that this also involves

18  consulting on dietary supplements?

19  A      There were some that would be classified today as

20  dietary supplements, yes.

21  Q      What was it that you consulted on that today would

22  classified as a dietary supplement?

23  A      I can't tell you the exact things.  It's been so

24  long ago.

25  Q      Okay.

                                    7

1   A      Metabolic Products Corporation involved a dietary

2   supplement used to treat urinary problems.

3   Q      What was that dietary supplement?

4   A      I can't remember the name of it.

5   Q      The CV says that you've been a general consultant to

6   Metabolic Products Corporation from 1966 to the present.

**Gerraughty depo**

7       Is that accurate?

8       A       Yes, they still call me on occasion, but I don't do

9       much work for them, haven't done much work for them in the

10      last five or six years.

11      Q       The dietary supplement product that you consult with

12      them on, does that involve ephedra?

13      A       No.

14      Q       Does it involve caffeine?

15      A       No.

16      Q       And you say it has something to do with urinary?

17      A       Yes, urinary problems.

18      Q       And you can't remember the name of the product?

19      A       No, because I haven't done any work with them on

20      that product recently.

21      Q       It is a dietary supplement, though?

22      A       Yes, it was listed as a dietary supplement.  Let me

23      look.  Spimaco Company in Saudi Arabia, which is number 36.

24      They have vitamins and vitamin combinations with minerals.

25      Q       This is the Saudi Arabia consulting that we talked

                                        8

1       about earlier?

2       A       Yes.

3       Q       Do any of their products contain herbal substances?

4       A       Yes.

5       Q       What herbal substances are in their products?

6       A       They have a number.  I can't recall from memory

7       exactly which ones they were.  The main ones that I dealt

Gerraughty depo

8   with were vitamins and minerals.  They did have some plant

9   materials in some of their products.

10   Q     Did any of the plant materials consist of ephedra?

11   A     No.

12   Q     How about caffeine?

13   A     I'm not sure.

14   Q     Does Spinaco import product into the United States?

15   A     I don't know whether they do or not.  They've been

16   in the process of trying to get permission, or trying to

17   get clearance, to ship products to the U.S.  They ship to

18   other Middle Eastern countries.

19   Q     As far as shipping to other Middle Eastern

20   companies, that would not be covered by DSHEA, would it?

21   A     No.

22   Q     Does your consultancy with Spinaco involve

23   compliance with DSHEA?

24   A     Yes, because the vitamins come under DSHEA and the

25   minerals.

                                    9

•

1   Q     Even though they only ship in the Middle East?

2   A     I'm not sure they only ship in the Middle East.

3   That's my problem

4   Q     So you're not sure that they import into the United

5   States?

6   A     I'm not sure, no.  I don't know whether they've

7   begun or not.

8   Q     Would it be fair to say that if they don't import

9   into the United States, that DSHEA or the reach of DSHEA

Page 9

Gerraughty depo

10    doesn't reach them?

11    A       I would think that would be the case, yes.

12    Q       Any others?

13    A       There's a lot of them on here, for example, Abbott

14    Laboratories, Lilly, they have some products that are

15    dietary supplements, but I didn't consult with them

16    specifically.

17    Q       I understand that, and that's a good point.  I'm

18    looking for the consultancies that you've been involved

19    with that are listed here or that maybe haven't made it on

20    your CV that involve dietary supplements, because I'm

21    looking for your experience in the dietary supplement area.

22    A       In those cases, I have to say, in some cases, I

23    spent more time on dietary supplements, and some cases I

24    spent more time on drugs.

25    Q       And you're talking about the cases that we've talked

10

·

1    about already, right?

2    A       I'm sorry, I don't understand.

3    Q       That was a bad question.  When you said, in those

4    cases, some of it is more for dietary supplements, and some

5    of it is more for drugs, are you talking about your

6    consultancies with Abbott and Lilly?

7    A       Yes, and other companies, too.

8    Q       What dietary supplements have you been involved,

9    other than what we've talked about already, either with

10    Abbott or Lilly or these other companies that you're

Page 10

Gerraughty depo

11    telling me about.  What dietary supplements have you

12    consulted on?

13    A      Mostly on vitamins and minerals, and I would say

14    that would be mostly it.  In the case of Spimaco, it was

15    more natural products, so plant drugs.

16    Q      But that also involved vitamins, and vitamins and

17    minerals?

18    A      Yes.

19    Q      Have you ever consulted with a company with regard

20    to ephedra or a caffeine product?

21    A      No.

22    Q      Have we gone through, now, all the consultancies

23    that you've been involved with dealing with dietary

24    supplements?

25    A      I believe so.

                                                    11

1     Q      I see from the first page of this that you have a

2     Ph.D in pharmaceutical sciences?

3     A      Yes.

4     Q      What is pharmaceutical sciences?

5     A      Well, there are several pharmaceutical sciences.

6     Usually, at the lower level, the Bachelor's and Master's,

7     you specialize in one of them  In the case of the Ph.D.

8     from the University of Connecticut, you take pharmacology,

9     you take manufacturing pharmacy, you take a broad --

10    although, I majored in manufacturing pharmacy, I covered

11    some of the other areas, too, and course work for that.

12    Q      Are you talking about in your undergraduate days?

Page 11

Gerraughty depo

13    A      No, I'm talking about graduate school.  I took some

14    in pharmacology.  I had to take some other courses in

15    pharmacology, statistics, things like that.

16    Q      Your Ph.D. in pharmaceutical sciences, is that

17    equivalent to a Ph.D. in pharmacology?

18    A      I would say equivalent to a Ph.D. in pharmacy.

19    Q      I understand that, at least in the past, you've been

20    a licensed pharmacist?

21    A      Yes, I have.

22    Q      Are you still currently licensed?

23    A      No, I'm on retired status as far as being a

24    registered pharmacist in several states.

25    Q      Did you go on to retired status in 1991?

12

•

1    A      No, I went earlier than that, because I was in

2    teaching and administration.

3    Q      In the past, had your pharmacy licenses in any state

4    ever been denied?

5    A      No.

6    Q      Ever been revoked?

7    A      No.

8    Q      Have they ever been suspended?

9    A      No.

10    Q      Other than the pharmacy licenses that you have held,

11    have you ever been licensed in any other professions?

12    A      No.

13    Q      Other than the consulting in which you are engaged

Gerraughty depo

14    in presently, are you involved in any other activities such

15    as teaching and things of that nature?

16    A    Yes, I'm an adjunct facility member at the

17    University of Rhode Island, and I usually give a series of

18    lectures on manufacturing pharmacy and good manufacturing

19    practices just about every year.

20    Q    To whom are those lectures given?

21    A    Undergraduate and graduate students in pharmacy at

22    the University of Rhode Island.

23    Q    Is there a College of Pharmacy at the University?

24    A    Yes.

25    Q    So you give it to students that reside or

                                   13

1    matriculate in the College of Pharmacy?

2    A    Yes, that's correct.  They do have some other people

3    who sit it on them, but I don't know why.

4    Q    When you teach these, how many days a year would it

5    consist of?

6    A    Three or four.

7    Q    On the first page of your CV, you list some

8    additional training underneath your education, which goes

9    on for this first page here.  At least as far as I

10    understand that, none of it seems to be in the food and

11    drug field.  Is that correct?

12    A    Yes, because that would be picked up somewhere else.

13    That's probably true.

14    Q    I understand, okay.  On page 4 of your CV under the

15    heading Positions Held, the last entry there indicates that

Gerraughty depo

16    you've been a Consultant on Pharmaceutical Issues from 1958
17    to the present.  Do you see that there?
18    A    No.  Page 4?
19    Q    Page 4, right above Military Service.
20              MS. ABARAY:  He's on page 4 of the fax.
21    Q    I'm looking at page --
22    A    Oh, okay, I'm getting confused by that.
23    Q    I'm going from the actual CV page numbers, so there
24    you go.  Do you see the --
25    A    Yes, I do.

                              14

1     Q    This would refer to the consultancies which we've
2     talked about earlier, right?
3     A    Some of them, yes.
4     Q    When you're talking about pharmaceutical issues,
5     you're talking about manufacturing, formulations, stability
6     of pharmaceutical products, correct?
7     A    Yes, and good manufacturing practices.
8     Q    When you talk about pharmaceutical products, you're
9     talking about prescription pharmaceutical products and
10    over-the-counter products?
11    A    Both.
12    Q    On the next page of your CV, I see that you were the
13    Director of the University of Rhode Island Training Course
14    for the U.S. Food and Drug Inspectors?
15    A    That's correct.
16    Q    What did you do as the Director of that training

Gerraughty depo

17    course?

18    A      Organize getting faculty to teach the course.

19    Basically, it was between three and four weeks.  It was

20    three weeks for a while, and then it was a four-week course

21    later.  It would be lining up faculty, setting up study

22    plans, and scheduling lectures, and I gave a large portion

23    of the lectures in the course myself.

24    Q      And it would be to people that were employed for the

25    U.S. Food and Drug Administration?

15

1     A      Food and Drug Administration investigators, yes.

2     Some of them were pharmaceutical investigators, and some of

3     them were food investigators.

4     Q      You list that you did that during the time period of

5     about 1963 to 1972, 1990 and 1992, is that right?

6     A      That's correct.

7     Q      Were you paid for doing this?

8     A      Yes, but I had to limit what I could take, because I

9     was working for the University.  They gave me permission.

10    It was during the summer that the courses were taught.

11    Q      Who paid you?

12    A      The University did.  They paid the University and

13    the University paid me a stipend, mainly, not for the

14    teaching, but for the administration of the course.

15    Q      Would the University, then, have a contract or

16    receive a grant from the United States government to pay

17    for your services?

18    A      Yes.

Page 15

Gerraughty depo

19    Q       If you could turn to the next page of your CV, this
20    actually talks about grants and contracts that you have
21    received?
22    A       Yes.
23    Q       Number 3 lists an annual FDA contract to conduct
24    Training Course for Drug Inspectors, do you see that there?
25    A       Yes.

16

•

1    Q       And this also has a date period or time period from
2    1963 to 1972?
3    A       Yes.
4    Q       And that matches up, at least, with that first time
5    period on the previous page where you were the Director?
6    A       I think so, yes.
7    Q       Does this grant or contract refer to that training
8    course that you gave?
9    A       That would be for those training courses, yes.
10   Q       And at least as you've described them on page 6, it
11   was a training course for drug inspectors, right?
12                   MS. ABARAY:   Are you asking as opposed to
13                   food?
14                   MR. ERNY:   Yes.
15   Q       There's no mention of any food inspectors in here.
16   A       It was mainly drug inspectors, so that's why I said
17   that.
18   Q       And that would be true with the other time periods,
19   where you were the Director of the University of Rhode

Page 16

Gerraughty depo

20    Island Training Course.   That dealt mainly with drug

21    inspectors, correct?

22    A    Yes. I would assume so, yes.

23    Q    Well --

24    A    Yes, it was.

25    Q    Okay.   Have you ever done any consulting work for

17

1    anybody in the food industry?

2    A    Specifically, in the food industry, I've done some

3    consulting for Ross Labs.   They have infant formulas and so

4    forth.

5    Q    Are infant formulas treated as foods?

6    A    Yes, most of them are.

7    Q    Anybody else?

8    A    I can't recall.   I can't recall whether any of those

9    involved foods or not.

10    Q    The consulting that you did for Ross Labs., what did

11    that involve?

12    A    I reviewed some documents for them and made some

13    recommendations for good manufacturing practices.

14         MS. ABARAY:   Does food include cosmetics,

15         when you're asking him?

16         MR. ERNY:   I didn't intend it to do that.

17    Q    What GMP's did you utilize in consulting with them?

18    A    I'm sorry, I don't understand.

19    Q    Well, if I understand, the regulatory scheme in the

20    United States has current good manufacturing regulations as

21    they pertain to foods, correct?

Page 17

Gerraughty depo

22    A      Yes.

23    Q      And then in a separate set of regulations, there are

24    current good manufacturing practices for over-the-counter

25    products, correct?

18

1    A      Basically, they don't divide, but they do divide

2    within.  Yes, I would say that's a reasonable statement.

3    Q      Then there's still yet another set of current good

4    manufacturing practices for pharmaceutical products?

5    A      Prescription drugs.

6    Q      Right, right, correct.  So when you consulted with

7    Ross Labs, were you utilizing the current good

8    manufacturing practices set out in the federal regulations

9    for food products?

10    A      Yes.

11    Q      So you have some familiarity with them?

12    A      Yes.

13    Q      Let's change gears on you a little bit.

14    A      Okay.  Are we done with this?

15    Q      For right now we are, yes.  Actually, I lied.  I'm

16    not going to change gears.  We talked previously about some

17    consultancies that you've done for some dietary supplement

18    manufacturers, in particular, companies that had vitamins

19    and mineral products, and the one company that had some

20    plant materials.  What set of regulations did you rely upon

21    when you consulted with those companies?

22    A      Basically, the DSHEA.

Gerraughty depo

23    Q    I'm going to refer to that as DSHEA, okay?

24    A    Okay.

25    Q    Does DSHEA actually set forth current good

19

1    manufacturing practices?

2    A    No, they leave most of them up to the individual

3    company, but they do require that they be safe.  The only

4    thing that's different is they don't require them to be

5    effective.  They would like them to be effective, but they

6    don't require it.

7    Q    You said that DSHEA requires, I think your words

8    were -- actually, I can't recall, but you said it requires

9    them to establish their own manufacturing practices?

10    A    It requires them to meet standards of safety and

11    non-adulteration.

12    Q    Let me just state for the record that -- let me do

13    it this way.  We'll get back to this.

14        (Whereupon, Exhibit Number 2 was marked

15        for identification.)

16    Q    Dr. Gerraughty, let me show you what the court

17    reporter has marked as deposition Exhibit Number 2.  That's

18    the deposition notice, and in the deposition notice, we've

19    asked you to bring your file and you have in turn have

20    brought your file and showed it to me.  Is that right?

21    A    That's correct.  I did not bring all of the

22    depositions and all the paperwork.  It's a huge amount.

23        MR. ERNY:  Let's go off the record.

24        (Whereupon, there was a discussion off the

Page 19

Gerraughty depo

25          record.)

20

1              MR. ERNY:  While we were off the record, Ms.
2       Abaray and I had a discussion with regard to Dr.
3       Gerraughty's file, and we've agreed to do two
4       things.  First of all, Dr. Gerraughty is going to
5       compile a list of the other material that he has,
6       which he has not brought to the deposition, and
7       provide that list to Ms. Abaray who will provide it
8       to me, and we've also agreed that the court reporter
9       will take the file, which Dr. Gerraughty has brought
10      with him to the deposition, and copy the complete
11      contents of that.  That copy will be marked as
12      Exhibit Number 3 to the deposition.  Is that
13      accurate, Ms. Abaray?
14              MS. ABARAY:  That's fine.
15              THE DEPONENT:  May I get a clarification,
16      please?
17              MR. ERNY:  Yes.
18              THE DEPONENT:  Some of them that were sent to
19      me didn't deal with GMP issues at all, and I didn't,
20      other than open them up and find out they're going
21      to be about something else, I didn't really review
22      them
23              MR. ERNY:  Would it be possible on that list
24      if, for example, you got a deposition, and you just
25      flipped through and found that it didn't deal with
Page 20

Gerraughty depo
21

1        GMP's, you just wrote, does not deal with GMP's?
2               THE DEPONENT:   Yes, I can to that.
3               MR. ERNY:   Off the record, again.
4        (Whereupon, there was a discussion off the
5        record.)
6   BY MR. ERNY:   (Resuming)
7   Q       Dr. Gerraughty, one of the things in your file, and
8   I'm going to give it to you, but I'm not going to
9   separately mark it, is a copy of Public Law 103-417, the
10  Dietary Supplement Health and Education Act of 1994.   Can
11  you point out to me where in DSHEA it provides that the
12  manufacturers are individually responsible for establishing
13  their own manufacturing practices to ensure purity and
14  safety of their products?
15  A       I just got this this morning from Janet.
16              MS. ABARAY:   He had asked for another copy.
17              MR. ERNY:   Let me do it this way, then.   Let
18       me get this marked as Exhibit 4.
19       (Whereupon, Exhibit Number 4 was marked
20       for identification.)
21  Q       Dr. Gerraughty, the court reporter has marked as
22  deposition Exhibit Number 4 the Preliminary Review of
23  Documents in this matter.   This is the report that you have
24  provided to Ms. Abaray following your review of the
25  materials, right?

22

Gerraughty depo

1    A    Yes, that's correct.

2    Q    If you turn to page 2 of that, the second page of

3    that report, you say in the second paragraph, "While cGMP

4    regulations have not been finalized, DSHEA provides that

5    manufacturers are individually responsible for establishing

6    their own manufacturing practices to ensure purity and

7    safety of their products."  Do you see that there?

8    A    Yes, I do.

9    Q    Is that the standard by which you measured

10   Metabolife's conduct?

11   A    Yes.

12   Q    Where in DSHEA do you find that proviso, that the

13   manufacturers are individually responsible for establishing

14   their own manufacturing practices to ensure purity and

15   safety of their products?

16   A    I can't tell you now, because I don't have my copy.

17   I was unable to find my copy.  That's why I asked her to

18   bring me another one.

19   Q    Okay, could you look at the copy that Ms. Abaray

20   brought for you and pull that out for me.

21            MS. ABARAY:  This copy only shows the

22         amendments.  You need the whole statute.

23            THE DEPONENT:  Yes, this is only the

24         amendments, so I can't from this.

25            MR. ERNY:  Well, actually --

23

Page 22

Gerraughty depo

1              MS. ABARAY:  This is G that gets added on to
2         21 U.S.C. 342, but you need all of 21 U.S.C. 342 to
3         see the rest of the sentence.
4              MR. ERNY:  Actually, that's the public law
5         that enacts DSHEA, so this amends that statute to
6         add the Dietary Supplement Health and Education Act.
7              MS. ABARAY:  That's what I'm saying.
8              MR. ERNY:  Right.
9              MS. ABARAY:  But it doesn't have the whole
10        rest of it, so it only has half sentences.
11             MR. ERNY:  But the whole rest of it doesn't
12        have anything to do with the Dietary Supplement
13        Health and Education Act.
14             MS. ABARAY:  Well, but Fred, what I'm saying
15        is, it says, Section 402, as amended -- as amended
16        by adding at the end, the following, and so you get
17        a sentence fragment, so you have to read the rest
18        of the sentence to get the whole thing, so do
19        you have a copy of the whole statute?  Would that be
20        helpful?
21             MR. ERNY:  Let me see.
22   BY MR. ERNY:  (Resuming)
23   Q      Before DSHEA was enacted in 1994, were there any
24   federal regulations as they relate to current good
25   manufacturing practices that related to dietary
                                    24

•

Page 23

Gerraughty depo

1    supplements?

2                    MS. ABARAY:   I'm going to object to the

3                extent you're calling for a legal conclusion, and

4                especially because dietary supplements was not

5                separated out as a separate entity before those

6                acts, so to the extent you can answer --

7    A    I don't know.

8    Q    But in your report, you say that DSHEA provides this

9    standard that you're measuring Metabolife against?

10   A    Yes, and I believe that's really a quote that I took

11   from a document that I couldn't find yesterday or the day

12   before yesterday.

13   Q    That document was the Dietary Supplement Health and

14   Education Act?

15   A    Yes.

16   Q    And you're saying that this copy within your file

17   that Ms. Abaray provided to you was not the complete copy

18   of DSHEA?

19   A    I don't believe it was, no.

20                   MS. ABARAY:   Just so the record is clear, the

21               copy that we printed out are the DSHEA amendments to

22               the Food, Drug, and Cosmetic Act, but unfortunately,

23               you need the rest of the Act to put them in the

24               proper context, and I don't have those here with me

25               today.

                                   25

•

1                    MR. ERNY:   I have, actually, only one copy of

Gerraughty depo

2       21 U.S.C. 321.  That's the statute that you were

3       relying on to find this standard?

4             THE DEPONENT:  It looks like it.

5             MR. ERNY:  Can you point out for me where you

6       find the language of the standard that you said you

7       quoted?

8             MS. ABARAY:  Can you give him the amendments

9       back?

10            MR. ERNY:  Yes.

11            THE DEPONENT:  Can I have a minute?

12            MR. ERNY:  Oh, absolutely.  Do you mind if I

13       come and look over your shoulder since I only have

14       one copy there?

15            THE DEPONENT:  No, sir.  I'm not finding it,

16       and this looks like at least part of what I had.

17            MS. ABARAY:  Does this have the DSHEA

18       amendments on it, Fred?  The copy you gave him, does

19       it have the DSHEA amendments included?

20            MR. ERNY:  I pulled that from United States

21       Code, and the second to the last page is the pocket

22       part, so I assume that it does.

23            THE DEPONENT:  Let me look a little more.

24       (Whereupon, the deponent reviewed documents.)

25            THE DEPONENT:  This deals mainly with the

26

1       definitions, and I believe it was under Purpose.

2            MS. ABARAY:  Is this --

3            THE DEPONENT:  Let me see.  That's part of

Gerraughty depo

4              it.   This isn't the exact quote, and I think that
5              was an exact quote that I put in my report.   Oh,
6              let's see, first of all, it was amended by adding at
7              the end the following, it is a dietary supplement
8              and it has been prepared, packed or held under
9              conditions that do not meet current good
10             manufacturing practice regulations including
11             regulations requiring, when necessary, expiration
12             date labeling issued by the secretary under this
13             subparagraph 2.
14   BY MR. ERNY:   (Resuming)
15   Q      So that's a reference in DSHEA to current good
16   manufacturing practices, but it doesn't say anything in
17   there about manufacturers being individually responsible
18   for establishing their own manufacturing practices,
19   correct?
20   A      I didn't find it in here, no.
21   Q      And in fact, the next section that you're looking at
22   actually reserves to the Secretary of HHS, the ability to
23   prescribe good manufacturing practices, don't they, or I
24   should say, doesn't it?
25   A      Yes, and they have -- they're similar along the line

27

1    in preparing those, I think.
2    Q      So then your testimony would be, certainly, when you
3    prepared this report in September, there weren't any
4    current good manufacturing practices as they apply to

Gerraughty depo

5   dietary supplements?

6   A      I can't say yes to that, because there were some

7   proposed regulations that were circulating for comment.

8   Q      Had the Secretary of HHS promulgated binding current

9   good manufacturing practices in September when you did your

10  report?

11  A      No, I don't think so.

12  Q      So we're clear again, in the materials that you've

13  just looked at, you don't see anywhere in there the quote

14  that utilized to set the standard by which you're measuring

15  Metabolife, which is, "manufacturers are individually

16  responsible for establishing their own manufacturing

17  practices to ensure purity and safety of their products."

18              MS. ABARAY:   Let me just make a statement on

19          the record.   You've handed him 21 U.S.C. 321.   The

20          DSHEA amendments apply to 21 U.S.C. 342, 21 U.S.C.

21          331, and 21 U.S.C. 343, so he's only been given

22          piecemeal copies of statutes.

23              MR. ERNY:   And that's why I restrict it to

24          what he's reviewed.

25              MS. ABARAY:   Well, I just went through, let
                                    28

1           records reflect, he did review all the statutes.   He

2           brought his notes in his file today, so I apologize

3           for any inconvenience here.   I mean, are you trying

4           to get out are these minimum standards?

5               MR. ERNY:   No, I'm trying to get out that

6           he's setting a standard here that I don't find

Gerraughty depo

7       anywhere in DSHEA, and he's using that standard to

8       measure Metabolife by.  That's the point.

9             MS. ABARAY:  Well, do you think they don't

10      have to have any -- they can just do whatever they

11      want?  They don't have to have any regs?

12            MR. ERNY:  I'm not going to debate it with

13      you on the record.  He says that DSHEA provides

14      this, and it's not in DSHEA.  That's my point.

15            THE DEPONENT:  I think it is, but I haven't

16      found it.

17            MR. ERNY:  Okay, fair enough.

18  BY MR. ERNY:  (Resuming)

19      Q     Now I'm going to change gears on you, Dr.

20  Gerraughty.

21      A     Okay.

22      Q     When were you first contacted by Ms. Abaray's office

23  about this case?

24      A     I'm not sure.  I don't remember.

25      Q     Would it help to look at your file?

                            29

1       A     It might.  I think in September.  It appears to be

2   September.

3       Q     Who was it that first contacted you?

4       A     Ms. Abaray.

5       Q     What were you told, if you can recall, in this

6   initial conversation?

7       A     I don't recall exactly, but I can tell you the

                        Page 28

**Gerraughty depo**

8    general gist was that she wanted me to review some

9    materials in light of good manufacturing practices and what

10   were required for dietary supplements.

11   Q      Were you given an assignment or task, if you will?

12   A      Yes, to report back on whether I felt that they were

13   doing a good job with manufacturing practices.

14   Q      Did you talk, during that conversation with Ms.

15   Abaray, about current good manufacturing practices that

16   were applicable to dietary supplements?

17   A      Yes, she said that it was a dietary supplement that

18   she was talking about, and that basically, she wanted me to

19   look at it from that point of view, the fact that it was a

20   dietary supplement.

21   Q      At least as reflected in what will be Exhibit 3, in

22   September you were sent a proposed rule from February 6,

23   1997 discussing the FDA's announcement that it was

24   considering whether to institute rule making to even

25   develop current good manufacturing practice regulations for

30

1    dietary supplements.  Let me show that to you.

2    A      Yes, I see it.

3    Q      At least in September, you were aware that the

4    Secretary of Health and Human Services had issued this

5    advanced notice on proposed rule making where they were

6    seeking comments to help it decide whether it should

7    institute rule making to develop GMP's for dietary

8    supplements?

9    A      Or to modify them, yes.

Gerraughty depo

10    Q      And you say it were to modify them, so is it your

11    opinion that there were current good manufacturing

12    practices applicable to dietary supplements at that time?

13    A      There were proposed rules from FDA.

14    Q      Prior to receiving this information, were you, in

15    fact, aware that HHS was considering whether to issue

16    current good manufacturing practices applicable to dietary

17    supplements?

18    A      Yes, I was.

19    Q      How did you learn about that?

20    A      I attended a number of meetings during the year,

21    symposiums, meetings, and I'm sure I learned it at one or

22    more of those.

23    Q      Did you provide any comments to Health and Human

24    Services about their proposal?

25    A      For dietary supplements?

                                    31

1     Q      Yes.

2     A      Only what I provided from the floor.  They had FDA

3     people there at the meeting, and they had a discussion.

4     They had workshops, and they had a discussion, and I

5     provided some there, but I didn't write them

6     Q      Where was this meeting held?

7     A      I don't remember.  I think it was New Orleans.

8     Q      When was that?

9     A      Early last year I would guess.  And I talked to FDA

10    people on the phone, because I still do consulting for

Gerraughty depo

11  them

12  Q     Was it your testimony that you were asked about

13  GMP's for dietary supplements?

14  A     No.  I was attending their meeting, and they were

15  talking about it, and they asked if there were any

16  questions or comments, and I made some comments and asked a

17  couple of questions.

18  Q     Do you remember what comments you made?

19  A     I remember one that I made -- that I thought they

20  needed to make the regulations a little tighter than they

21  were then, because a number of these dietary supplements

22  now contain drugs.

23  Q     Are what you're saying, at least as of last year, is

24  that you believed when you were at this meeting in New

25  Orleans that there were current good manufacturing

32

1  practices applicable to dietary supplements?

2  A     Yes.

3  Q     And you felt that the existing, at that time,

4  current good manufacturing practices were not tight enough?

5          MS. ABARAY:  He was referring to the proposed

6          regulations, Fred.

7          MR. ERNY:  You were referring to the proposed

8          regulations or the actual regulations?

9          THE DEPONENT:  The proposed regulations.

10  Q     Do you know how it was that Ms. Abaray came to

11  contact you or find out about you?

12  A     I had testified in a case in Cheyenne, Wyoming in

Gerraughty depo

13    which she was involved some years ago.  That's where I met

14    her.

15    Q      That would have been the albuterol cases?

16    A      Yes.

17    Q      For Copley?

18    A      Yes.

19    Q      And you testified there about good manufacturing

20    practices for pharmaceutical products?

21    A      Yes.

22    Q      When you were first contacted by Ms. Abaray I

23    presume that you were provided certain materials to review?

24    A      Yes, I was.

25    Q      And at least your report, which has been marked as

                                    33

1    Exhibit 4, suggests that you reviewed the deposition of

2    David Brown and the deposition of Dirk Aschmoneit and the

3    deposition of Michael Scott?

4    A      Yes.

5    Q      When you were first provided materials, were you

6    provided anything other than those three depositions?

7    A      I don't recall whether there were other things or

8    not.

9    Q      Since that time, you've indicated to me that you've

10    reviewed Jeff Brady's deposition?

11    A      Yes.

12    Q      And the exhibits to that?

13    A      Yes.

Gerraughty depo

14  Q       And you were also provided another packet of

15  information about the Canadian regulatory action and some

16  other things, and you're going to provide that list to me,

17  right?

18  A       Yes, and also the Brown deposition I got later.

19  Q       The David Brown deposition you got later?

20  A       Yes.

21          MS. ABARAY:  That might have been Boozer.

22          THE DEPONENT:  Then Boozer was later.

23  Q       Did Dr. Boozer's deposition have anything to do with

24  good manufacturing practices?

25  A       A little in that it was a study, and it wasn't well

34

1   controlled, but it wasn't a key document as far as I was

2   concerned.

3   Q       It impacts on any opinions you may have with regard

4   to the Boozer study, but it doesn't impact on current good

5   manufacturing practices, is that accurate?

6   A       I think that's reasonably accurate, yes.

7           MR. ERNY:  Ms. Abaray has pointed out

8           something in DSHEA and underlined it for you.  Tell

9           me what it says?

10          THE DEPONENT:  "fails to meet the quality

11          (including tablet or capsule disintegration),

12          purity, or compositional specifications, based on

13          validated assay or other appropriate methods, that

14          the supplement is represented to meet".

15  Q       You testified earlier that the standard that you've

Page 33

Gerraughty depo

16    set forth in your report you believed was a quote that you

17    pulled from some of the materials, and what you've read

18    here, doesn't match up with that quote, is that right?

19    A     No, it doesn't match up with that quote, and I still

20    believe that was an exact quote.

21    Q     So that exact quote, at least as far as the

22    materials that you've reviewed, isn't in DSHEA?

23    A     I don't know whether it is or not.

24              MS. ABARAY:  It doesn't have quotation marks

25              on it in the report, either.

                              35

1    Q     After you reviewed the materials, you prepared this

2    preliminary report, correct?

3    A     That's correct.

4    Q     Did anybody assist you in preparing it?

5    A     Yes, my daughter typed it.

6    Q     Did you receive any input from Ms. Abaray or anybody

7    on her staff?

8    A     About the report?

9    Q     Right.

10    A     Only after I sent it.

11    Q     So you created a draft and sent it to Ms. Abaray?

12    A     Yes.

13    Q     I'm going to hand you a document which I pulled out

14    of your file.  Is this the draft that was circulated to Ms.

15    Abaray?

16    A     I'm not sure anymore.

                              Page 34

Gerraughty depo

17    Q        I say that because I note that there are some
18    penciled in corrections on there, which suggests that it
19    was a draft.
20    A        I think it is.  I think it's the one that I faxed to
21    her.
22    Q        So you sent a draft to her, and what happened next?
23    A        She called me, and we talked.  She said she thought
24    the report was okay.  She didn't have any problems with it.
25    She asked me a couple questions about it, terms that I used

36

1     that she didn't understand, but I notice that this is the
2     draft, I'm sure, because I made some mistakes in English
3     and spelling and so forth, and I corrected these primarily
4     so that my daughter could do a revised.
5     Q        Would you mind if we write on that document the word
6     draft, just so that it's clear when we get the copies back
7     from the court reporter?
8     A        I don't have any problem
9     Q        Can I give you a pen and ask you to write that on
10    there?
11    A        Sure.  Okay.
12    Q        Thank you, and I'll put that back in your file.
13    Then, after you made the revisions to this draft, the next
14    report was the final report that you signed and prepared
15    and what's marked as --
16    A        Yes, the other one that you have.
17    Q        Which is Exhibit 4?
18    A        Yes.
                    Page 35

Gerraughty depo

19    Q     Other than Ms. Abaray and your daughter who was

20    typing it, have you discussed the report with anybody else?

21    A     I don't believe so.

22    Q     You haven't talked to anybody at FDA or anybody like

23    that?

24    A     Well, I talk to people at FDA all the time, and I

25    might have talked about some general issues, but I didn't

                              37

1     talk about the specific report.

2     Q     What general issues would you have talked to them

3     about?

4     A     They frequently call and ask my opinion on things,

5     but it's usually them calling me, not me calling them

6     Q     Did you discuss Metabolife with any of the FDA

7     folks?

8     A     No, not as such.  I might have discussed some of the

9     things regarding Metabolife, one or two, but I didn't

10    identify it.

11    Q     What do you remember discussing with the folks at

12    FDA about Metabolife?

13    A     They were indirectly related to the Metabolife

14    report.  I don't remember anything, to be honest with you,

15    that I did.

16    Q     Did you memorialize any of those discussion with the

17    FDA folks?  Are there any notes about that?

18    A     No, they were pretty brief.

19    Q     Did you meet with Ms. Abaray to prepare for the

Gerraughty depo

20    deposition?

21    A    No, she came in last night, and we had dinner

22    together, is all, my wife and I and Ms. Abaray.

23    Q    Had your wife met Ms. Abaray previously?

24    A    No, but she talked to her on the phone.

25    Q    Did you have a good meal?

38

1    A    Yes, pretty good.

2    Q    I'm sure it was better than the one that I had.

3    When you had dinner last night, did you discuss the

4    deposition?

5    A    We discussed that I was going to come here this

6    morning and the time and things like that, but no, not

7    really in any detail.

8    Q    Did she give you the copy of DSHEA last night or was

9    that provided to you this morning?

10    A    No, this morning.

11    Q    Any other documents that were shared?

12    A    No.    She looked at my file, I think, but that's all.

13    Q    Did she pull anything out of the file?

14    A    No.

15    Q    We talked previously about recently the FDA

16    proposing a rule to establish current good manufacturing

17    practices for dietary supplements.   Do you recall

18    discussing that?

19    A    Yes.

20    Q    And that happened on March 13th?

21                    MS. ABARAY:   What year?

Page 37

Gerraughty depo

22                    MR. ERNY:   Of 2003.

23       A       I don't remember.

24       Q       Have you read anything from the Federal Register

25       where the FDA recently --

                              39

•

1        A       Yes, I have, but I don't remember the details.   Yes,

2    I have, but I didn't remember what the date was on it.

3        Q       How did you hear of that?

4        A       Through friends who also do consulting.

5        Q       And you actually reviewed the document?

6        A       I don't think I did.

7        Q       So you wouldn't be relying on that for your opinions

8    in this case?

9        A       No.

10       Q       In Exhibit 4, your report, is that a complete

11   statement of your opinions in this case?

12       A       No, it says, preliminary.

13       Q       What other opinions do you have that aren't

14   reflected in that case?

15                    MS. ABARAY:   Let me just also add, before you

16               get started, these reports were filed in October, I

17               believe, and we've taken several depositions since

18               then which have been provided to him

19                    MR. ERNY:   I understand.   That's why I'm

20               asking him

21                    THE DEPONENT:   And I've got notes in that

22               folder on some of those that I did since this.

Gerraughty depo

23          MR. ERNY:  Do you need to look at those notes
24      to tell me what your opinions are?
25          THE DEPONENT:  Yes, I would need to.
                                    40

1           MR. ERNY:  Let me give you your notes, then.
2       Just so you know where we're going, you have a
3       preliminary report that sets forth certain opinions,
4       and I'm here today to make sure that I get all the
5       opinions that you have, so that we can talk about
6       them
7           THE DEPONENT:  Okay.  I may need to compare
8       it to 4, too.
9           MS. ABARAY:  I'm putting all those back
10      together.
11  A       I got a lot of information from the deposition of
12  Jeff Brady, which had been taken on February 20, 2003, and
13  I, according to my notes, reviewed it on the 19th of
14  March.  It confirmed an opinion that I had earlier that
15  ACERIS audits were not on a regular basis.  Although they
16  mentioned that they would be yearly, there were gaps.  I
17  learned that Dr. Dash, during the ACERIS inspection, took
18  no notes during audits, or at least Jeff Brady said he
19  took no notes, and he gave no written documents to Alpine
20  about the audit.
21          MS. ABARAY:  Let me just stop you there.  I
22      think he has opinions about that, Fred?  Do you
23      want to --
24          MR. ERNY:  We'll go through that.
                            Page 39

Gerraughty depo

25                    THE DEPONENT:  Shall I continue?

41

1                    MR. ERNY:  Yes.

2       A        Sometimes my handwriting is difficult to read.

3       I've got problems with my eyes.  He disagrees with the

4       observations on the hand-washing facilities, and I

5       couldn't tell whether they had those extra ones he talked

6       about or not, but he didn't seem to think that hand-

7       washing before going back to the manufacturing area was

8       that important, but I do.  He believes that log books are

9       not critical because everyone makes errors.  He stated

10      that Metabolife does not review logs for accuracy and

11      completeness.  I consider that to be a very poor practice,

12      not to review them  He keeps copping out that everyone

13      makes errors.  Had a sign that Alpine was a registered

14      drug establishment.  It was not.  He said he was unaware

15      of the sign.  He didn't review previous 483's, but he

16      argued that there were not repeat problems.  He'd have to

17      review the previous ones to see that there weren't.  He

18      admits failure to follow aerobic count limits.  The

19      aerobic counts were high.  He admits the failure to follow

20      those but kind of shrugs it off.  There was a storage

21      problem, segregation, storing a contaminated product with

22      ephedrine.  He also stated there were no written rework

23      SOP's, standard operating procedures for reworks.  There

24      were six lots of a product formulated with a rejected raw

25      material.  One of the very serious things is when he talks

Gerraughty depo
42

1    about equipment or an area being clean.   As you read his

2    deposition, he means visually clean.   There's a difference

3    between clean and visually clean.   In other words, he

4    feels if you can't see anything on it, it's clean, and

5    he's their chief quality assurance person.   There were

6    furniture and unnecessary equipment, file cabinets and

7    things like that, in a manufacturing area that were very

8    dirty and dusty, and that's a serious problem with safety.

9    You can have cross-contamination.   They had no evidence of

10   validation of the use of ethylene oxide to reduce the

11   bioburden or the aerobic counts that were high or its

12   potential effect on other components in the Product 356.

13   It also established, in more detail for me, that the

14   amount of ephedrine was being -- that this would involve

15   daily, that exceeded that allowed by Texas and Ohio laws.

16   Innovative Health Products, which is one of their contract

17   manufacturers, had an incomplete quarantine on the

18   computer only.   That's not enough.   You've got to label

19   the containers so there can be no mix-up.   Chemins was

20   never audited by ACERIS is a note that I have, and they

21   were later.   I found one later, later on after I reviewed

22   this deposition.   It appears that the assay for ephedra

23   alkaloids was not validated, proven to work.   Brady

24   questions the accuracy of the method used to assay for

25   ephedra and caffeine.   That's HPLC, which is highly

43

Gerraughty depo

1     accurate.   While specs can be changed, this has to be done
2     by a proper control system   He also says that caffeine is
3     a GRAS substance, generally regarded as safe ingredient.
4     It's not.   It's an active compound, and typically, GRAS
5     substances are fillers like those things of that nature.
6     They adjust the potency up or down in a rework.   They make
7     a batch of the product, and then they check it, and if
8     they get an out of specification result, they retest it,
9     but they don't test the same sample, and it's typical that
10    you would retest the same sample.   Then, if the second
11    sample passes, they release it.   If it doesn't, they
12    rework it.   This is at the finished product stage with the
13    tablets.   They take the tablets and grind them up and
14    spike it if it's low, or dilute it if it's high, to adjust
15    the potency of ephedrine/caffeine at least.   That's an
16    extremely dangerous practice, and would certainly affect
17    safety of the product.   I think that the attempt to rework
18    finished tablets is unacceptable and dangerous.   It
19    increases the chances for cross-contamination, it could
20    dilute down some ingredients and not others.   It's an
21    extremely bad practice.   That involved safety.   That's it
22    on his.   This is the packet of materials that kind of are
23    miscellaneous.   It had Bates numbers on the cover sheet.
24    The Bates numbers were MET 50982 to MET 51182.   It's a
25    series of letters and copies of certifications regarding
                                                    44

·

Gerraughty depo

1    ACERIS certification of -- this is where I found the -- is
2    it Chemins?
3                MS. ABARAY:    Chemins, I think.
4    A        That's where I found the Chemins one, although Jeff
5    didn't think they'd ever had it done.    Alpine Health
6    Products and Innovative Health Products appear to have
7    gaps.    It covered the periods between 1997 and 2002.
8    Scott, in his earlier deposition, had said that they do
9    that annually.    There weren't annual ones in there.    There
10   were several missing.    It also contained the Form 483
11   issued on 1/21/00 and the EIR for an inspection of 1/13/00
12   to 1/21/00.    These are both FDA documents listing six
13   objectionable conditions, including poor training, poor
14   raw material control, inadequate sanitary conditions,
15   uncleaned equipment, and inadequate pest control in the
16   warehouse.    The EIR also discussed inadequate labeling
17   controls.    It said that photos were taken, but there were
18   no copies in the materials that I got.    Let's see.    I have
19   to read my own writing again.    There was a follow-up
20   report on May 16, which showed a number of GMP
21   deficiencies.    Many remained uncorrected in a follow-up
22   inspection.
23   Q        What facility was that?
24   A        I believe it's Innovative Health Products.
25   Q        The portion that you're referring to are Jeff
                                   45

Page 43

Gerraughty depo

1    Brady's audits of Innovative Health Products?

2    A    Yes, and he had two follow-ups that were both in

3    there, and they found several that still hadn't been done,

4    and they found some new ones.

5    Q    Do you find that Jeff Brady conducted thorough

6    audits of Innovative Health Products?

7    A    I beg your pardon?

8    Q    Did Jeff Brady conduct thorough audits of Innovative

9    Health Products.

10   A    I'm not sure, because he doesn't list some areas

11   that would normally be listed. And then, there's a series

12   of follow-up letters by Brady to Innovative Health

13   Products, sent by Brady on 5/23/01 and 11/12/01. On

14   2/12/02, there were still repeat issues, six of them

15   There were also some new and different problems cited.

16   There is a memo of a follow-up visit. There's a long

17   series of what I think are room temperature stability

18   results for the various ingredients that are in Product

19   356. There's some accelerated and room temperature

20   stability. At least that's what it appears to be. It's

21   not well labeled. It's not well identified, so it's kind

22   of impossible to get too much out of it. There's no

23   indication of what the method was that was used or whether

24   it was stability indicating. Do you want me to explain

25   what I mean by stability indicating?

46

•

1    Q    Sure.

Gerraughty depo

2    A    Some assays, some tests, show only whether the

3    material, let's say, ephedrine, pick ephedrine as one, and

4    nothing else.  I mean, that method only picks up the active

5    that you're trying to test for.  If there are some

6    derivatives or degradation products that get into the

7    batch, it would not indicate those.  That's stability

8    indicating.  You only want to know what the stability is of

9    the drug.

10   Q    Are there current good manufacturing practices

11   applicable to dietary supplements that require stability

12   testing?

13   A    I think that safety requires stability testing.

14   Otherwise, you're not going to know when they expire.

15   Q    So the answer would be?

16   A    And it could involve purity issues, too.

17   Q    But my question was, are there any current good

18   manufacturing practice regulations applicable to dietary

19   supplements that require stability testing?

20              MS. ABARAY:  I think this has been asked and

21         answered.

22   A    Yes, in my opinion, there are.  Oh, and then I found

23   out from those documents, too, there's no indication of the

24   permissible range for chromium  There's a long list of

25   companies, 19 of them, that are suppliers of ephedra to the

47

1    contract manufacturers and to Metabolife.  That's way too

2    many to assure proper control.  Typically, firms, even in

3    the food industry, will have two or maybe three suppliers.

Page 45

Gerraughty depo

4      I've seen it up to four, but I've never seen anybody have

5      19 suppliers that they're trying to control.  There was

6      some other internal audit information, but it wasn't

7      labeled, so I can't identify what it would go to.

8      Q      Those points are reflected on the notes that you

9      created when you read Jeff Brady's deposition, looked at

10     the exhibits to Jeff Brady's deposition, and then these

11     additional documents that you received?

12     A      Right.  That's all of the yellow pages.  I think

13     that's all the notes that I had.

14     Q      So in connection with your report and what you just

15     told us, that would constitute your opinions in this case?

16     A      I'm sorry, that would what?

17     Q      That would constitute what your opinions are in this

18     case?

19     A      Yes, and I don't think I had a separate one for Mr.

20     Brown, but he verified some of the things that the other

21     had.

22     Q      Let's talk about a little of these things.

23             MS. ABARAY:  I tell you what.  If you're

24             getting ready to switch, maybe we could take a

25             little break?

48

●

1             MR. ERNY:  Sure, that would be fine.

2             (Whereupon, there was a brief recess.)

3             MR. ERNY:  Before we go on -- Christina, here

4             on the phone, asked that we try to speak up a little

Gerraughty depo

5      bit.   I guess it doesn't come through clearly.

6                  THE DEPONENT:  Okay, sorry.

7                  MR. ERNY:  Can I see your file, there, Dr.

8      Gerraughty?

9                  THE DEPONENT:  Sure.

10     BY MR. ERNY:  (Resuming)

11     Q      Dr. Gerraughty, when you read Jeff Brady's

12     deposition and created these notes of the deposition, and

13     you created these -- you read to me the opinions that

14     you've had.  I want to talk to you about some of those

15     things.  You referenced a FDA 483 inspection report from

16     January, 2000, correct?

17     A      Yes.

18     Q      Do you know whether Alpine was, in fact,

19     manufacturing Metabolife 356 in January of 2000?

20     A      I don't know for certain.  I wasn't there.

21     Q      Did you pull anything from Jeff Brady's deposition

22     that would indicate whether they were manufacturing

23     Metabolife 356 at that point?

24     A      I don't recall.

25     Q      A number of the criticisms in the 483 report dealt

                                    49

1      with the cleaning of mixing vats for liquid product.  Do

2      you recall that?

3      A      Not only mixing vats, other pieces of equipment,

4      too.

5      Q      For liquid products and things of that nature?

6      A      No, some of them were -- they used a Fitz mill.

Gerraughty depo

7    It's called a Fitz mill. It's a Fitzpatrick mill. When
8    they ground up these tablets when they were too potent or
9    less potent than they should be, they ground them up in a
10   Fitz mill, apparently, from what they said, and a Fitz mill
11   is -- you could look at it and say, hey, yeah, it's clean.
12   It looks visually clean, but down inside in the cutting
13   chamber that actually cuts these up, there could be all
14   kinds of powder.
15   Q     I want to restrict my questions, though, to the FDA
16   483 report that you're relying on, and in particular, that
17   portion of it which talked about the mixing vats for the
18   liquid product. Do you remember that?
19   A     Yes.
20   Q     Metabolife 356 is not a liquid product, is it?
21   A     No.
22   Q     And the 483, Establishment Inspection Report, didn't
23   make any comments about mixing vats for powdered
24   substances, did they?
25   A     As I recall, no.
                                     50

1    Q     You also talked about, there was no evidence of
2    validation of ethylene oxide use in the product. Do you
3    remember that?
4    A     Yes.
5    Q     Are you aware of whether that product that was
6    treated with ethylene oxide was actually shipped?
7    A     No, I'm not.
                           Page 48

Gerraughty depo

8    Q        You mentioned that the ACERIS audits are not on a

9    regular, yearly basis?

10   A        Scott said that they were, but I didn't find that to

11   be true, and what Jeff Brady said is, he didn't think they

12   were on a regular, yearly basis, either.

13   Q        Do you find the fact that it wasn't audited on a

14   yearly basis to be a problem?

15   A        No, not particularly, except that that was the only

16   audit that they recommended, or that they carried out with

17   their contract manufacturers.  FDA is only required to

18   inspect every two years, but there was more than two years

19   between some of the ACERIS qualifications.

20   Q        When you say the FDA is required to inspect every

21   two years, what is it that they're required to inspect?

22   A        The pharmaceutical plants.

23   Q        And of course, Metabolife 356 is a dietary

24   supplement, right?

25   A        Well, it contains a drug.

                                    51

·

1    Q        Why is it that you say it contains a drug.

2    A        Ephedrine is a drug, and ephedra alkaloids are

3    drugs.  In my opinion, it's a drug.

4    Q        But the FDA doesn't treat Metabolife 356 as a drug,

5    does it?

6    A        It doesn't specifically state it, as far as I know.

7    Q        It treats it as a dietary supplement, right?

8    A        Yes, right.

9    Q        And in the regulatory scheme of things, dietary

Gerraughty depo

10    supplements are not drugs, correct?

11    A     No, they're closer to foods.

12    Q     And so your opinion that these are drugs is actually

13    quite different than the FDA's?

14    A     I don't know that it would be different than the

15    FDA's, but the regulations don't spell it out.

16    Q     The regulations don't spell out that it's a drug?

17    A     Well, they don't specifically deal with ephedra, as

18    such, or caffeine.

19    Q     Now, you also talked about the discussion of the log

20    books in Jeff Brady's deposition, remember?

21    A     Yes.

22    Q     And again, those log books that they were talking

23    about in that Establishment Inspection Report dealt with

24    the cleaning of the liquid mixing vats, correct?

25    A     That's right.

52

1    Q     And you're not aware of there being any errors or

2    irregularities in log books, as it relates to the mixing of

3    the powdered substances to create Metabolife 356?

4    A     Yes, I am  They say they don't review log books.

5    How would they know?

6    Q     Have you reviewed the log books?

7    A     No, I've reviewed what they said about them

8    Q     So you're not aware that there's any errors in them?

9    A     I'm not aware what?

10    Q     That there are any errors in them?

Page 50

Gerraughty depo

11    A       No, other than the ones that were cited

12    specifically.

13    Q       Relating to the liquid product?

14    A       That bothers me a little bit.  I think there was one

15    related to the solid product, too.  I think there was a

16    reference to that, to one of the pieces of equipment.

17    There certainly was a reference to the Fitz mill, and you

18    would not use a Fitz mill for liquids.

19    Q       And you're referring to, now, the use of the Fitz

20    mill in the FDA Establishment Inspection Report?

21    A       No, there was something in the Brady deposition

22    about it, too.

23    Q       And this was Jeff Brady's inspection of Innovative

24    Health Products, right?

25    A       Yes, that's correct.

53

1    Q       Was Innovative Health Products actually making, at

2    that time, Metabolife 356 for public consumption?

3    A       I don't know.

4    Q       You also mentioned the Ohio and Texas regulations

5    for ephedra  containing products?

6    A       Yes.

7    Q       And your thought that the test results of the specs

8    would exceed the Texas and Ohio limits?

9    A       I got that from the deposition, yes.

10    Q       Do you know what the Ohio limits are?

11    A       I can't recall offhand, but I looked at them at the

12    time in the deposition.

Gerraughty depo

13  Q      I'll represent to you that the Ohio limits call for

14  the ingestion of not more than 100 milligrams of ephedra

15  alkaloids in any 24-hour period.  Now, the results that you

16  saw in the specs, they demonstrated ephedra alkaloid

17  amounts in the 13's, correct, 13 milligrams?

18  A      Yes, some of them were.

19  Q      And the Metabolife specs had an upper limit of 12.84

20  milligrams?

21  A      That's correct.

22  Q      Do you know how many Metabolife 356 tablets Robin

23  White took in any one day?

24  A      I have no idea.

25  Q      I want you to assume that the most she took in any

54

1  one day was six tablets, okay?

2  A      Yes.

3  Q      Let's just assume that we had a 15 milligram reading

4  in some of these results.  Can you assume that for me?

5  A      Can I what?

6  Q      Can you assume that the results of these tests

7  showed that there were 15 milligrams in some of the

8  tablets?

9  A      I can't assume it, no.

10  Q      Well, what do you recall being the highest value of

11  the spec, for caffeine -- I'm sorry, for ephedra?

12  A      I can't recall, offhand, without looking.

13  Q      Let me ask you to assume that it's 15 milligrams?

Gerraughty depo

14    A    Okay.

15    Q    If it's 15 milligrams per tablet, and Robin White

16    took six tablets per day, that would mean that she's taking

17    90 milligrams of ephedra alkaloids per day, correct?

18    A    If the assay is correct and so forth, and the number

19    of pills she's taking is correct, yes.  Six times fifteen

20    is ninety.

21    Q    Right, so at least as far as Robin White is

22    concerned, she would not be exceeding the Ohio limits?

23    A    I don't know.  I don't know that she took six

24    tablets a day.

25    Q    Well, I want you to assume that she took six tablets

55

1    a day.

2    A    Assuming that, it could be 90 milligrams, and it

3    would be below the Ohio standard.

4    Q    Thank you.  Now, you also said, assuming the assay

5    is correct.  You have some question that maybe it's

6    difficult to say, and it may not be correct?

7    A    Yes.  For example, when they got high results or low

8    results from their own spec -- they set the specs

9    themselves.  When they got high or low results, according

10    to Aschmoneit, what they did was, they merely ran another

11    assay, and if the second one came out okay, they released

12    it.  They didn't use the same sample that the original test

13    was done from  Usually, you save some of the sample and

14    retest it.  It was a different sample that they pulled, and

15    then, they retested it, and if it passed, it was okay, I

Page 53

Gerraughty depo

16    mean, they released.  That's what Aschmoneit says, if it
17    was okay.  If it wasn't, they reworked.  They took the
18    finished tablets, ground them up, and reworked and spiked
19    them or diluted them, depending on what the result was.
20    Q      Is it your testimony, then, that when a second test
21    was done, and it was still out of spec, that product always
22    got reworked?
23    A      No, it's not my assumption, but it shouldn't get
24    reworked at all, because it's a one out of two chance which
25    one was right -- the first one or the second one.

                                    56

1    Q      We'll talk about reworking, but didn't Mr.
2    Aschmoneit also testify that if it didn't make specs again
3    on the second test, that it was sent back to the
4    manufacturer and it wasn't sold?
5    A      Yes, but he also mentioned that some of it was
6    reworked.  I don't know if every lot was.
7    Q      You also said that the assay for the ephedra
8    alkaloids was not proven to work.  Do you remember saying
9    that?
10    A      No, I don't think that's what I said.
11    Q      In fact, the assay that they used was the HPLC
12    assay, high performance liquid chromatography?
13    A      I said I saw no data to support that it was done
14    properly.  As accurate as HPLC is, if you don't prepare the
15    sample properly, you don't get reliable results.
16    Q      Did you see any data about preparing accurate

                              Page 54

Gerraughty depo

17     samples?

18     A     About preparing what?

19     Q     Accurate samples?

20          MS. ABARAY:   Preparing samples accurately.

21          MR. ERNY:   Yes, preparing samples accurately?

22     A     I saw something about that, but basically, what I

23     saw was Aschmoneit saying that they tested so many samples

24     and then if they didn't make the spec, they retested, and

25     at one point, he indicated he didn't know whether it was

57

1     the same sample or not.  At another point, he said it was a

2     different sample.

3     Q     Did Mr. Brady talk about samples that were pulled

4     and tested?

5     A     He may have.  I don't know, but I didn't rely on

6     what he said.

7     Q     You didn't rely on what Mr. Brady said?

8     A     I don't think there was anything about sampling.

9     Q     You talk about relying on Mr. Aschmoneit.  You

10     understand he's a product manager?

11     A     I'm sorry.

12     Q     You understand that Mr. Aschmoneit is a product

13     manager?

14     A     Yes.

15     Q     What do you understand a product manager does?

16     A     Well, I can only describe what he said he did.

17     Q     Okay.

18     A     I mean, a product manager can do a lot of different

Page 55

Gerraughty depo

19    things.   Basically, he was responsible for the product.

20    Q      In effect, he described it as a marketing position,

21    didn't he?

22              MS. ABARAY:   I want to enter an objection

23              here.   You, Metabolife, offered Dirk Aschmoneit as

24              the knowledgeable 30(b)(6) witness to testify about

25              manufacturing, so if you want to turn around now and

58

1              say he doesn't know anything about manufacturing,

2              which I won't argue too much if he doesn't know

3              anything about manufacturing, but I don't think

4              anybody in your company does.   But I just want the

5              record to reflect you set him out in your Rule 26

6              disclosures as the manufacturing witness.

7    BY MR. ERNY:   (Resuming)

8    Q      In fact, Mr. Aschmoneit described product manager as

9    a marketing position, didn't he?

10    A      No, I don't believe so.

11    Q      Have you read anything about, other than Mr. Brady,

12    have you ready anything about the personnel used at

13    Metabolife's contract manufacturers?

14    A      Let me think that one over.   By name, you mean?

15    Q      Or generally about then?

16    A      Well, I think, I learned some things generally about

17    them, because they were manufacturing the product, and

18    they'd say, the labeling supervisor or the production

19    manager or the worker on the line, whatever the case may

Page 56

Gerraughty depo

20    be, but I didn't see an awful lot about them

21    Q      What is the United States Pharmacopoeia?

22    A      It's an official reference book of the U.S.

23    government on drugs.

24    Q      Does it have guidelines for manufacturing practices

25    for nutritional supplements?

59

1    A      I don't know.  I can't recall whether it's in there

2    or not.

3    Q      Are you aware, at the FDA's request, the American

4    Herbal Products Association proposed good manufacturing

5    practices for dietary supplements?

6    A      I read something about it, but I didn't have much

7    detail on it.

8    Q      Do you know who wrote them for the American Herbal

9    Products Association?

10    A      I think it was said that somebody from Metabolife

11    did.

12    Q      Do you know what the National Nutritional Foods

13    Association is?

14    A      No.

15    Q      Do you know if it has any guidelines for good

16    manufacturing practices for dietary supplements?

17    A      If they do, I don't recall.

18    Q      Well, did you review them?

19    A      I don't recall whether I did or not.

20    Q      You talked in your report about specification

21    problems, and in particular, that Mr. Aschmoneit had no

Page 57

Gerraughty depo

22    knowledge as to how they were decided upon or what

23    rationale was used.    Do you remember that?

24    A        Yes, I do.

25    Q        Why is it important knowing the source or the

60

1    rationale for the specifications?

2    A        Because the specifications shouldn't be changed by

3    anybody who's not a person in high authority, a person well

4    up in the company.   It was not only mentioned in

5    Aschmoneit's deposition.   It was also mentioned in Brady's

6    and in Brown's.

7    Q        Going to the time that the specifications were set,

8    when they were originally decided and set up, why is it

9    important to know the background as to how they were

10    originally set up?

11    A        If you have a problem with them later on, you want

12    to know who to go to, who's responsible for them, in my

13    opinion.   Basically, they were allowed to set their own

14    specs.   They could set their own specs, and if somebody

15    came in and said, hey, this spec is not good, or if

16    something changed, they found out more in toxicity of one

17    of the ingredients and so forth, you want to know who had

18    the ability to change specs, because you might want to

19    reduce it, or you might want to increase it.

20    Q        And in fact, the specs that were originally set up

21    were actually, as they progressed over time, made tighter,

22    weren't they?

Page 58

Gerraughty depo

23   A     Some were.

24   Q     Can you testify to any that were made looser?

25   A     There was one that wasn't tightened.

61

1    Q     So if they were changed, they were made tighter?

2    A     The specs were, yes.

3    Q     You also say that the quantitative requirements

4    were very loose.   What do you mean by quantitative

5    requirements?

6    A     Well, there were several reports of assays of the

7    material, and although the specs weren't extremely tight,

8    for example, caffeine, you could go 10 percent below or 25

9    percent above.   That's a pretty big range for caffeine,

10   which is an active compound.   Basically, the specs were too

11   loose in some categories.

12   Q     Too loose as compared to what?

13   A     As compared to what you would normally find.

14   Q     Normally find where?

15   A     In the vitamins, minerals.

16   Q     And the drug pharmaceutical field?

17   A     Yes, and the pharmaceutical field.   Normally, you

18   wouldn't allow a 35 percent swing in caffeine in the

19   pharmaceutical world.

20   Q     And of course, again, we're not in the

21   pharmaceutical world, though, are we?

22              MS. ABARAY:   Well, you asked him about the

23              pharmaceutical world.

24              THE DEPONENT:   Yes.

Page 59

Gerraughty depo

25      BY MR. ERNY:    (Resuming)

62

1    Q      Have you compared the specs and the swing, as you

2    call it, to what's used by other dietary supplement

3    manufacturers?

4    A      I didn't use their product, the label as such, but I

5    saw some in the USP as to what the minimum daily

6    requirements were, and what was toxic and what wasn't, yes.

7    Q      But have you seen any specs for high values and low

8    values?

9    A      No, they typically don't show specs.   They show

10   minimum daily requirements.

11   Q      And there's no minimum daily requirement for

12   caffeine?

13   A      No.

14   Q      And there's no minimum daily requirements for

15   ephedra alkaloids?

16   A      I hope not.

17   Q      You would agree that plant derived dietary

18   ingredients are characterized by greater variation in

19   product quality than synthetically derived dietary

20   ingredients?

21   A      I wouldn't characterize it as part of the quality.

22   I would say potency.   Yes, there would be differences in

23   potency.

24   Q      Well, if the FDA made that statement, would you

25   disagree with it?

Page 60

Gerraughty depo
63

1    A    That there were differences in quality?

2    Q    Greater variation of product quality?

3    A    No, basically, I wouldn't, although they're plant

4    materials and they're very variable.  They're more variable

5    than synthetics.

6    Q    Right.

7    A    I wouldn't characterize it that way.  The key issue

8    is potency.

9    Q    Your report also makes reference to at least the

10   possibility of pharmaceutical grades of ephedrine being

11   used and there not being an indication on the label, do you

12   remember that?

13   A    Yes, I do.

14   Q    Do you have any evidence that a pharmaceutical grade

15   ephedrine was used in Metabolife 356?

16   A    Only that they talked about spiking, and they talked

17   about dilution, because the ephedrine being higher.  I

18   think it was more likely it wasn't ephedrine, because,

19   typically, the results were over 12.84.

20   Q    I didn't hear.  Did you say it was more likely that

21   there wasn't ephedrine?

22   A    It would be less likely that ephedrine would be

23   spiked or diluted than caffeine.

24   Q    Other than the reference to the words "spiking" and

25   "dilution" in these depositions, do you have any evidence

64

Gerraughty depo

1    that pharmaceutical grade ephedrine was used for Metabolife
2    356?
3                MS. ABARAY:  I'm sorry, you're saying other
4         than the depositions?
5                MR. ERNY:  His question was there were
6         references to spiking and dilution, and I'm asking
7         him, other than those -- if that's what he bases his
8         opinion on, that there was pharmaceutical grade
9         ephedrine in it, that's fine.  I'm just trying to
10        find that out.
11               MS. ABARAY:  I don't think I -- maybe, could
12        you rephrase your question?
13   BY MR. ERNY:  (Resuming)
14   Q    Let me ask you this, do you have an opinion as to
15   whether pharmaceutical grade ephedrine was used in the
16   manufacture of Metabolife 356?
17   A    I don't know.
18   Q    You also talked in your report about caffeine.  You
19   said, when you're talking about labeling problems, "The
20   principle problem in this area was that synthetic materials
21   used were not indicated on the labeling, particularly for
22   caffeine."  What did the label say?
23   A    The label said Guarana, Guarana seed, as I recall.
24   Q    Did you see any labels that also listed caffeine
25   under other ingredients?

                                65

Page 62

Gerraughty depo

1    A      I did not.

2    Q      In your opinion, what should the label have said?

3    A      It should have indicated what the content was in

4    terms of if they used Guarana seed, how much did they use

5    of that.   If they used caffeine to spike it, to increase

6    it, that should be on there, too.

7    Q      In what way?  What would you suggest the labeling

8    should say?

9    A      The milligrams, the percent, or some quantitation of

10   the amount of Guarana seed and some of the caffeine USP.

11   Q      Can you point out to me one dietary supplement

12   product that uses such a label like that?

13   A      That what?

14   Q      That uses such a label like that?

15   A      I can't specifically point one out, but I have seen

16   some where they will use a mixture of two alkaloids and

17   other derivatives, or something of that nature, but they

18   list it on the label.  I've seen instances in which there

19   are two sources for one drug, one a natural source and one

20   a synthetic source, and they list both.

21   Q      Do they list it as a synthetic caffeine?

22   A      No, I don't think they say synthetic.  I think they

23   say caffeine USP, anhydrous caffeine USP.

24   Q      Do you recall any label that contains caffeine

25   anhydrous USP?

66

Gerraughty depo

1                    MS. ABARAY:  For what product?  Are you
2          talking --
3                    MR. ERNY:  Any product.
4     A     Specifically?
5     Q     Yes.
6     A     Yes, Metabolife 356.
7     Q     Is it your opinion that the Metabolife label says
8     caffeine USP anhydrous on it?
9     A     No, it doesn't say that.
10    Q     And I'm asking, can you tell me any label that does?
11    A     Not offhand.  I'd have to do some research on it.
12    Q     When did you detect this use of USP caffeine first
13    occurring?
14    A     I don't recall the date.  It was in one of the
15    depositions.  It was in two of the depositions.
16    Q     Correct me if I'm wrong, but my recollection is that
17    these documents arose in 1999?
18    A     I think that's correct.
19    Q     Do you know when Robin White first started taking
20    Metabolife 356?
21    A     No, I don't know.
22    Q     Do you know when Robin White stopped taking
23    Metabolife 356?
24    A     No, I don't.
25    Q     So you don't have any idea as to whether Robin
                                   67

•

1     White's Metabolife 356 contained USP caffeine?

Gerraughty depo

2    A    I don't know.

3    Q    How would we know if it did?

4    A    If somebody had checked it beforehand.

5    Q    Do you know if Robin White retained the Metabolife

6    356 that she took?

7    A    Do I know if she what?

8    Q    If she retained it, if she kept it?

9    A    I don't know what you mean by "kept it."

10   Q    Well, you said if we could check it out, we could

11   find the product that she used and we could test it,

12   couldn't we?

13   A    Yes, you could.

14   Q    Do you know whether Robin White kept the product so

15   that it could be tested?

16   A    No, I have no idea.

17   Q    I'll represent to you that her mother, Ocie Perry,

18   testified that she threw the product away.  Because of

19   that, nobody can test it, can they?

20   A    If it's been thrown away, no, unless they have

21   reserve samples.

22   Q    And if she threw the bottle away, we wouldn't even

23   be able to get a lot number or anything, would we?

24   A    Probably not, but some pharmacies keep lot numbers

25   in their record keeping systems.

68

1    Q    And you're talking about for pharmaceutical

2    products?

3    A    Basically, yes.

Gerraughty depo

4    Q    You wouldn't expect a pharmacy to keep lot numbers

5    for Metabolife 356, would you?

6    A    No.

7    Q    Is caffeine an approved food additive?

8    A    What do you mean by "an approved food additive?"

9    Q    Well, can caffeine be used in foods?

10   A    Oh, yes.

11   Q    And you testified that caffeine is not on the FDA's

12   generally recognized as safe list?

13   A    Yes, I don't believe it is.

14   Q    Did you actually go through the regulations to see

15   if, in fact, it was?

16   A    I went through the copy that I had at home.   It

17   wasn't the most recent copy.   Then my wife ran it through

18   the computer, ran the GRAS list through the computer.   It

19   wasn't on the GRAS list.   It was on the computer, which was

20   recent.

21   Q    So is it your opinion that caffeine is not on the

22   FDA's generally recognized as safe list?

23   A    I don't believe it is.

24   Q    Is the molecular structure of synthetic caffeine

25   different from a natural caffeine?

69

1    A    Sure.

2    Q    In what way?

3    A    Well, you've got other things in the Guarana seed.

4    You've got other materials in there besides caffeine.

Page 66

Gerraughty depo

5     Q     I'm specifically referring to the actual caffeine

6     molecule or atom, if it's appropriately called that way.

7     A     It should be the same structurally.

8     Q     Are there any pharmacological differences?

9     A     Oh, there could be, because there's other materials

10    in --

11    Q     Are you aware of there being any pharmacological

12    differences?

13              MS. ABARAY:  I don't think you let him finish

14         his answer.

15              MR. ERNY:  I'm sorry.

16    A     I don't know.

17    Q     Are there any pharmacokinetic differences?

18    A     There could be, I don't know.

19              MS. ABARAY:  I think your question if vague.

20         Differences between what?  Let's be a little more

21         specific.

22    Q     Have you reviewed the literature to see if there are

23    any pharmacokinetic differences between herbal caffeine and

24    synthetic caffeine?

25    A     No.

                              70

•

1     Q     Is one more dangerous than the other?

2     A     I don't know.  I don't know what the other materials

3     are that are in that.

4     Q     Do you know whether caffeine is an approved over-

5     the-counter stimulant?

6     A     No, I can't recall.  I know it's in Coke, tea and

Gerraughty depo

7    coffee.

8    Q    Let me ask you a question.  Are you going to be

9    rendering an opinion as to whether Metabolife 356 is safe

10   and effective in this case?

11   A    No, I'm going to be rendering an opinion as to

12   whether I think they followed the practices that they

13   should have regarding safety and purity.

14   Q    Are you going to offer any opinions as to whether

15   Metabolife 356 played a causal role in Robin White's

16   injuries, or in any of these plaintiffs' injuries?

17   A    No.

18   Q    Your report also notes -- it refers to some what you

19   characterize as poor documentation, and you said you found

20   large gaps in documents which made them inadequate to

21   ensure quality control or qualify assurance?

22   A    Yes.

23   Q    Does this, then, mean that the finished product was

24   impure?

25   A    No, but it could be.

                              71

·

1    Q    We just don't know, though?

2    A    Well, you can't be certain unless you check it out.

3    Q    Does it mean that the finished product was unsafe?

4    A    It certainly could.

5    Q    But again, we don't know?

6    A    I'm not sure you could know.

7    Q    You also talked about -- in the context of labeling

Gerraughty depo

8    problems, you made the statement that wordings were

9    eliminated or changed without adequate explanation, and as

10   an example, you gave a toll-free number to report adverse

11   reactions was eliminated during one label change, remember

12   that?

13   A    Yes, I do.

14   Q    Did you review the labels of Metabolife 356?

15   A    The ones that were in the depositions.  They had --

16   there were some exhibits of labels.

17   Q    Did those labels provide an 800 number on them?

18   A    I can't recall whether they all did or not.

19   Q    Some of them did?

20   A    I think I saw an 800 number on one.

21   Q    Did any of those labels say anything about these

22   numbers to report adverse reactions?

23   A    I don't think they spelled it out, no.

24   Q    So is it your opinion that that number was placed

25   on there for people to report adverse reactions?

72

1    A    I don't know.

2    Q    So then, the statement in your report that there

3    was a toll-free number to report adverse reactions which

4    was eliminated during one label change, really has no

5    support, does it?

6              MS. ABARAY:  Do you want to refer to where

7          you're looking at in the report?

8              MR. ERNY:  The top of page 6.

9    A    Well, I maybe went too far with my interpretation

Gerraughty depo

10    on that, in that I believed that the reason for the toll-
11    free number was if there were any problems with the
12    product.  Yes, I did.  I don't know why else you'd put a
13    toll-free number on there.
14    Q    Well, in fact, the label says for health questions,
15    call, and then it list the 1-800 number, doesn't it?
16    A    I can't remember.
17    Q    Have you ever been asked to consult with the FDA as
18    part of the approval process on whether labeling for a
19    particular drug is adequate?
20    A    Yes, a few times in the past, yes.
21    Q    For how long had that consulting been going on?
22    A    I've been consulting with FDA since approximately
23    1958.
24    Q    My question, though, relates to for how long have
25    you been consulting with the FDA?
                                    73

1    A    For how long?
2    Q    As part of the approval process on whether labeling
3    for a particular drug is adequate?
4    A    Since probably 1958, from time to time.  I don't do
5    it every day.
6    Q    Dr. Gerraughty, do you remember being deposed in
7    1992 in the Susan Sidel case?
8    A    Yes.  I don't remember the details, but I remember.
9    Q    Well, and I only have one copy of this, so let me
10    come over, and you can read along with me.

Gerraughty depo

11    A    Okay.

12    Q    First of all, this is a copy of that deposition.

13    A    Okay.

14    Q    You were asked, beginning at page 61, have you ever

15    been asked to consult to the FDA as part of the approval

16    process on whether a labeling for a particular drug is

17    adequate, and your answer was no.  First of all, did I

18    read that correctly?

19    A    Yes, you did.

20    Q    Was that your testimony, then?

21    A    I don't recall, but if it was, I had been.

22    Q    So then, your testimony was wrong, then, before?

23    A    Yes, it was wrong, not intentionally.

24    Q    Are you going to render any opinions as to the

25    labeling of Metabolife 356 in this case?

74

1    A    Only in the sense that the label control wasn't

2    good, in that they had two different versions of the same

3    label in the label issuing room, and there could be a

4    potential for mix-up.

5    Q    And that relates to the FDA establishment

6    inspection report.  That was one of the criticisms that

7    the FDA brought up?

8    A    I can't recall whether it was or not, but it could

9    have been.

10          MS. ABARAY:  I just want the record to

11          reflect he also has a heading called labeling

12          problems in his written report.

**Gerraughty depo**

13              MR. ERNY:  Well, that's why I'm asking him,
14         because he said he may have gone too far on this
15         toll-free number to report adverse reactions.
16              MS. ABARAY:  I think he restated his
17         testimony.
18              MR. ERNY:  The record will be clear.
19              MS. ABARAY:  I want the record to be clear
20         that he put comments regarding labeling problems in
21         his written report, and we've already covered some
22         of those earlier.  You asked about the synthetic
23         products.
24    BY MR. ERNY:  (Resuming)
25    Q      Now, your report also talks, again on page 6, about

                                    75

1    excessive out of specification results?
2    A      Yes.
3    Q      Did any of the out of specification product go to
4    the public?
5    A      I don't know.
6    Q      Did any of the out of specification product go to
7    Robin White?
8    A      I don't know.
9    Q      And you say that "OOS results must be investigated
10   and a failure investigation is required to try to
11   determine the cause?"
12   A      Yes.
13   Q      What standards are you relying on to give that

                              **Page 72**

Gerraughty depo

14    opinion?

15    A    Safety.

16    Q    Is there a place where I can find these safety

17    standards written down somewhere?

18    A    Yes, under the GMP's.  It's a safety portion of the

19    GMP's, in that, if, for example, you get an OOS result,

20    the reason you have to do an investigation is to find out

21    what happened so that it doesn't happen again and affect

22    future batches or to determine whether it's happened

23    before.

24    Q    You say that's based on safety standards?

25    A    Yes.

76

1    Q    My question is, is there some place I can go to

2    find where these safety standards are written down?

3    A    Yes, you can look in the drug GMP's.

4    Q    How about the dietary supplement GMP's?

5    A    They don't list the safety features.

6    Q    Thank you.

7    A    But they were allowed to set their own standard,

8    and the standard they set, they don't meet.

9    Q    How many times does the Alpine manufacturing

10    facility test each batch of their product?

11    A    I'm sorry?

12    Q    How many times does the Alpine manufacturing

13    facility test each batch of their product?

14    A    I don't know that they do.

15    Q    How many times is it tested by HPLC?

Gerraughty depo

16    A    I would assume any time it was tested.  That's the
17    method they use.
18    Q    You talk on page 7 of your report about reworks of
19    finished product batches, and you state in there, "it was
20    the policy of Metabolife to allow remanufacture of the
21    batch of caplets."
22    A    Caplets, yes.
23    Q    Caplets.  From where did you determine this policy?
24    A    From the depositions.
25    Q    From Mr. Brady's and Mr. Aschmoneit's depositions?

                                    77

1    A    Mr. Brady's, certainly, and I think Mr.
2    Aschmoneit's.
3    Q    Mr. Brady talked about a rework of a couple of
4    batches from two different manufacturers, right?
5    A    Yes.
6    Q    Do we know if that rework product ever got to the
7    public?
8    A    I don't know.
9    Q    Are you aware of there being any other specific
10   instances of reworking of product?
11   A    Aschmoneit did say that that was one of the
12   procedures.  They sent it back to the manufacturers for
13   rework if it didn't pass the second time.
14   Q    Were the rework products subject to a lesser
15   quality control checks than the original product?
16   A    Since they had no written procedure, I couldn't

                            **Page 74**

Gerraughty depo

17    tell.

18    Q      How does reworking of product increase the chances

19    for contamination?

20    A      They were ground up in a Fitz mill, and since the

21    Fitz mill wasn't verified as being clean, you could have

22    got contamination as a result of that interacting.

23    Q      Let me just stop you there.  Your testimony about

24    the Fitz mill not being clean relates to Jeff Brady's

25    inspection of the IHP facility in Florida, correct?

                                78

1     A      Yes.

2     Q      Are you aware of whether IHP at that time was, in

3     fact, manufacturing Metabolife 356?

4     A      I don't know.

5     Q      Okay.  Go ahead.  I'm sorry to have interrupted.

6     A      Basically, reworking tablets from the finished

7     product is going to be hard to get the particle size, you

8     can't be sure how good the tablets are going to be from a

9     cut-up, ground-up bunch of tablets, and it's a terrible

10    practice, reworking at that stage.  You might rework if

11    you had a couple of things in a liquid and you had to

12    refilter it, although, that's frowned upon, too.  But to

13    go from the finished product back, and then add other

14    ingredients to it, to either bring it up to potency or

15    bring it down within the potency range, is a very, very

16    dangerous practice.

17    Q      You indicated in your report, "While reworks are

18    sometimes permitted by FDA," so it's not a totally taboo

                         Page 75

Gerraughty depo

19    subject, correct?

20    A      No, it's not, but FDA requires a written procedure,

21    which they didn't have, and it requires very good

22    verification that everything went okay.

23    Q      And when you're talking about what the FDA

24    requires, are you referring again to pharmaceutical

25    products?

79

1    A      Yes.

2    Q      Are you aware that the FDA's proposed new rule

3    regarding dietary supplement manufacturers permits

4    reworking or reprocessing of a batch which deviates from a

5    master record?

6    A      No.  I am aware that they will allow reworks, but

7    they require it to be in writing and well controlled, and

8    at only certain stages.  I'm sure they wouldn't approve it

9    at the finished product stage.  I've seen companies try to

10   do that, at the finished product stage, and FDA said, no.

11   Q      And in that instance, that would be with regard to

12   pharmaceutical products, right?

13   A      The ones that I'm talking about, yes.

14   Q      And you say that the process of reworking is labor

15   intensive and costly?

16   A      Yes.

17   Q      Isn't that the choice of the company?

18   A      Yes, I just put it in as a gratuitous comment.

19   Q      And that doesn't affect purity or safety?

Gerraughty depo

20    A    No, it shouldn't.

21    Q    You talk about adverse reactions reporting.  Where

22    did you learn that there were thousands of complaints of

23    adverse reactions?

24    A    In one of the depositions.

25    Q    Did you review any of those complaints?

80

1    A    No, that's not in my area.

2    Q    And you said there was no plan to investigate these

3    reports even though this was recommended to them by the

4    FDA and other scientists?

5    A    Yes, there was a letter from a man at FDA

6    recommending that they cooperate more fully with FDA, and

7    the industry and FDA work together for adverse reaction

8    reporting.

9    Q    Is that the letter where they encourage them to

10    report to the FDA?

11    A    Yes.

12    Q    That doesn't have anything to do with Metabolife's

13    plan to investigate them, does it?

14    A    I don't know.

15    Q    Do you know, at that time, the number of people

16    that the FDA had set aside to review adverse reaction

17    reports from dietary supplements?

18    A    No, I don't know.

19    Q    Do you have any idea of what kind of computer

20    system the FDA had at that point in time to utilize with

21    regard to reviewing adverse event reports for dietary

Page 77

Gerraughty depo

22    supplements?

23    A      No, I'm not aware at all.

24    Q      Other than this letter that you're talking about,

25    are there any other requirements for a dietary supplement

81

1     to investigate adverse reaction reports?

2     A      I don't know.  Wait a minute.  Yes, I do.  I'm

3     sorry.  I correct my answer.  They got some advice from

4     some of their own consultants.  Metabolife's own

5     consultants recommended that they do a better job of

6     reporting adverse reactions in Brown's deposition.

7     Q      What consultants were they?

8     A      I don't remember their names.

9     Q      And this is something that you say that David Brown

10    testified about?

11    A      Yes.

12    Q      Those are the only other scientists that you're

13    relying upon or referring to?

14    A      As far as I know, yes.

15    Q      You then say, "This product contained

16    pharmacologically active amounts of ephedra alkaloids and

17    caffeine, which would likely cause serious side effects."

18    Upon what is that statement based?

19    A      I'm sorry, I didn't hear it all.

20                 MS. ABARAY:  Is that buzzing bothering you

21           from the --

22                 THE DEPONENT:  Yes, it's bothering my

                    Gerraughty depo
23            hearing aids.

24                      MS. ABARAY:   Let me try to turn it down.

25        BY MR. ERNY:   (Resuming)

                                          82

1        Q      If you look at page 7, and look at the very last

2   sentence, do you see that sentence there?

3        A      Yes, I see it.

4        Q      Upon what is that sentence based?

5        A      Based on what the consultants told.

6        Q      What consultants?

7        A      The consultants that were reviewing the adverse

8   reactions.   That's where I picked it up.

9        Q      Is this something that was attached as an exhibit

10  to Mr. Brown's deposition?

11       A      I think that that was a misprint, too.   It should

12  be could likely, rather than would likely, as I recall,

13  because that was my opinion.

14       Q      Please understand, I'm not trying to pick on you or

15  anything, but that's an error in your report.   Instead of

16  saying, which would likely cause serious side effects, it

17  should be changed to say, which could?

18       A      Yes.

19       Q      You're not offering an opinion that Metabolife 356

20  causes serious side effects, are you?

21       A      No, only in that there were adverse reaction

22  reports, and that is a therapeutic amount of ephedra.

23  It's not subtherapeutic.

24       Q      Do you know whether ephedrine is approved as safe

                           Page 79

Gerraughty depo

25      and effective as an over-the-counter bronchodilator?

83

1      A      No, I don't know.  It may be.  I don't know.

2      Q      Would it surprise you to learn that the FDA

3      approved directions for the use of ephedrine as a

4      bronchodilator, that provides for an oral dosage of 12.5

5      to 25 milligrams every four hours, not to exceed 150

6      milligrams in any 24-hour period?

7      A      I don't know.

8      Q      Well, would it surprise you to learn that?

9      A      Yes, it would, because I think ephedrine's pretty

10      toxic.

11      Q      In fact, if those directions provided that those

12      dosages could be used even in children 12 and 13 years of

13      age and older, would that surprise you?

14      A      It certainly would.

15      Q      When you refer to serious side effects in your

16      report relating to adverse reactions, what do you mean by

17      that?

18      A      I mean the ones listed in USP and in toxicology

19      books.

20      Q      Can you give me some examples of serious side

21      effects.

22      A      Yes, anything that raises blood pressure, I think,

23      is serious.  Palpitations, serious.  Stroke is mentioned

24      as a possibility.  The psychotropic effects, irritability

25      and beyond.  There's a whole number of them

Gerraughty depo
84

1    Q       Does caffeine raise blood pressure?

2    A       No, I'm talking about ephedra.

3    Q       I'm switching gears on you.   Does caffeine raise

4    blood pressure?

5    A       I'm not sure, I'm not sure.

6    Q       Is it your opinion that Metabolife had a duty to

7    investigate adverse reactions?

8    A       Oh, yes.   I think that any company that puts out a

9    product and has adverse reactions should be looking into

10   it, yes.

11   Q       What should it have done?

12   A       It should have followed up to see.   There's an area

13   called complaint files which are used in the food

14   industry, the drug industry and so forth, complaint files

15   telling you about complaints.   It might be a complaint

16   that the tablet won't dissolve.   It's like a rock.   Or the

17   tablet breaks apart before I can take.   Or it might be, I

18   suddenly noticed that my blood pressure shot up, because I

19   have my own home cuff, so it could be of all types.   It

20   could be the material precipitated or changed color.

21   There's a whole bunch of things.   They call them complaint

22   files.   Part of that is adverse reaction files.   The

23   complaint files, FDA requires you, for reasons of safety,

24   again, to follow-up to see what happened, if it is a

25   legitimate complaint or a non-legitimate complaint.

85

Gerraughty depo

1    Q      Let me try to break this down, so I can understand
2    it better.   We talk about complaint files, and what I
3    sense you're saying is there are two categories of
4    complaint files.   There's one set of complaint files that
5    actually address the physical qualities, if you will, of
6    the product, like the tablet breaks apart, the liquid
7    precipitates, and things like that.   And your testimony is
8    the FDA requires the company to investigate those types of
9    complaints.   I would assume that that's to see if there
10   was a problem in the manufacture of that product to cause
11   it to do what it is not intended to do?
12                MS. ABARAY:   Object.   I'm not sure that was
13          his testimony.
14                MR. ERNY:   Well, that's why I'm asking him
15   A      No, basically, they don't keep the files
16   separately.   They bring in all of the complaints, which
17   could include adverse reactions.   Adverse reactions may be
18   reported from other sources to the federal government
19   directly -- hospitals, health professionals, and so forth.
20   When the company gets adverse reactions, they should be
21   sharing those with FDA, so that you can see if there's a
22   trend of these.   If you distributed to, we'll say, a
23   million people, and you only got one complaint, then it
24   probably wouldn't be enough to require you to do much
25   further.
                                86

Gerraughty depo

1    Q    You say that the company should share these with
2    the FDA?
3    A    Yes.
4    Q    What regulation can you point to that requires that
5    a dietary supplement manufacturer to share these
6    complaints with the FDA?
7                   MS. ABARAY:  I think it's asked and answered
8              that there aren't regs on dietary supplements.
9    Q    So you're referring to when they should about the
10   practices with pharmaceutical products?
11   A    No.  I think they should do it for foods, if
12   they're having a problem  If they're getting adverse
13   reactions from a food, it might be due to salmonella or
14   something like that.  I think they should do it for
15   dietary supplements or any product that's going to be
16   ingested.
17   Q    Would you agree that a dietary supplement company
18   has no power to compel someone to turn over their medical
19   records or even discuss their medical condition?
20   A    I think the same thing is true on the
21   pharmaceutical side.
22   Q    Right, right, and a pharmaceutical company or a
23   dietary supplement company has no legal power, if you
24   willed it, to require a physician to give information
25   about an adverse reaction report?

87

•

Gerraughty depo

1    A       No, but they can obtain it.

2    Q       They can obtain?

3    A       They can obtain the power to do it.  If the

4    individual agrees to let them do it.

5    Q       That's right, but if they don't, the companies have

6    no power to get this stuff?

7    A       I don't know the legal aspects of subpoenas and so

8    forth, so I can't say.

9    Q       Does the FDA have a specific consumer complaint

10   form or adverse reaction form that is to be used by

11   dietary supplement manufacturers?

12   A       I don't know.

13   Q       Is a reporting of adverse reactions by clinicians

14   or physicians or patients required anywhere?

15   A       Is it required?

16   Q       Yes, it is required anywhere by any regulation?

17   A       I don't know, but it's a good practice.

18   Q       And if adverse reaction reports for dietary

19   supplements are sent to the FDA, what division of the FDA

20   or what group in the FDA would actually receive them?

21   A       There's an office that receives them  I can't

22   remember the name of it.  I've been there, but I can't

23   remember the name of it.  They have a special section that

24   deals with those kind of issues.

25   Q       Do you have any expertise in determining whether an

                              88

1    individual adverse reaction report that is observed was

Gerraughty depo

2      actually caused by a drug or a substance?

3      A      Caused what?

4      Q      Caused by a drug or a substance?

5      A      I'm not sure I understand what you mean.

6      Q      Do you consider that you have any expertise in the

7      field of determining whether an individual adverse

8      reaction report observed was actually caused by the

9      substance in the adverse reaction report?

10     A      No, I don't have any training in that area.

11     Q      Do you know if it's possible to derive

12     scientifically reliable estimates of the incidents of

13     occurrence of adverse reactions from adverse reaction

14     reports?

15     A      I don't know.

16     Q      Is there any specific rule or requirement or

17     regulation in any of the FDA documents, that you're aware

18     of, relating to dietary supplements which you could rely

19     upon to state that Metabolife violated its duty with

20     regard to adverse reaction reporting?

21     A      Well, I would say from a safety point of view, they

22     didn't do a good job of it, but that's all I can say.

23     Q      In the adverse reaction reporting section of your

24     report, you refer to a short term clinical study.  Do you

25     see that at the top of page 8?

                                    89

•

1      A      Yes.

2      Q      What study are you talking about there?

3      A      I believe it's the one -- Boozer.  That was

Page 85

Gerraughty depo

4      Boozer's.

5      Q      The Boozer eight week study?

6      A      I think so.

7      Q      Have you actually reviewed the Boozer eight week

8      study?

9      A      I looked at the number drop offs and the percentage

10     of drop offs.

11     Q      From where did you get that information?

12     A      From the Boozer deposition.

13     Q      Where did you get that information in writing this

14     report?

15     A      It was mentioned in one of the depositions, which

16     would be the only place I could see it.

17     Q      Did you actually review the published study that

18     you're referring to here?

19     A      No.

20     Q      In what way does the fact that 8 of 35 patients

21     receiving Metabolife 356 and dropping out of a clinical

22     study -- how does that impact on your opinions about

23     adverse reactions reporting?

24     A      Well, because a good portion of the ones that

25     dropped out had adverse reactions.  That was the reason

90

•

1      they dropped out, according to the depositions.

2      Q      Did any of those people have strokes?

3      A      I don't know.  I can't recall.

4      Q      Did any of those people have seizures?

Gerraughty depo

5    A    I don't recall what they had, but they said that

6    they had adverse reactions.

7    Q    And adverse reactions could mean any number of

8    things, couldn't they?

9    A    Yes.

10                MS. ABARAY:   Do you want to take another

11            break?

12                THE DEPONENT:   Yes, maybe -- if we could

13            take five minutes.

14                MS. ABARAY:   It's been about an hour.

15            (Whereupon, there was a brief recess.)

16    BY MR. ERNY:   (Resuming)

17    Q    Dr. Gerraughty, I want to continue on with your

18    report.   On page 8, you refer to lead contamination.   Do

19    you see that there?

20    A    Yes, I do.

21    Q    And you say, "Hauser Laboratories found lead in at

22    least 3 batches of Product 356."

23    A    Right.

24    Q    Do you recall what year or what time frame that

25    was?

                                91

·

1    A    It wasn't well labeled.   Some of the materials were

2    not well labeled.   No, I don't.   I don't recall which year

3    it was.

4                MR. ERNY:   Off the record.

5            (Whereupon, there was a discussion off the

6            record.)

                      Page 87

Gerraughty depo

7    BY MR. ERNY:   (Resuming)

8    Q      Dr. Gerraughty, I'm going to walk over and show you

9    Exhibit 15 to the deposition of Dirk Aschmoneit, and it's

10   hard to read, but you see this last column that talks

11   about lead milligrams per caplet?

12   A      Yes.

13   Q      And there's in there three references to 0.01

14   milligrams of lead being found in three samples?

15   A      Right.

16   Q      Is this the document that you were referring to in

17   your report?

18   A      It's this document plus the testimony of Aschmoneit

19   in his deposition.

20   Q      Fair enough.  And this is dated April 27, 1999?

21   A      That's correct.

22   Q      Are you aware of there being any other instances

23   where testing of Metabolife 356 revealed the presence of

24   lead?

25   A      No.

92

1    Q      Is 0.01 milligrams per caplet a large amount of

2    lead?

3    A      No, but there shouldn't be any in there.

4    Q      I understand that, but is it a large amount of

5    lead?

6    A      You don't need much lead to have a problem, because

7    it's cumulative.  It stays in the body for long periods of

Gerraughty depo

8    time.  That's why they made some changes in the pain

9    industry.

10    Q      And you say, in fact, in your report, it "could

11    have serious implications in long term use?"

12    A      That's what I meant.  That it would build up.

13    Q      That's suggests to me that in the short term use,

14    it wouldn't have serious implications?

15    A      Probably not, if there's a one time occurrence or

16    two time occurrence.

17    Q      Other than these three instances, are you aware of

18    any other testing results revealing the presence of lead?

19    A      No, I'm not.

20    Q      Do you know if these three lots were sent to the

21    public?

22    A      I don't know.

23    Q      The next section of your report refers to spiking

24    with synthetic components, and it refers to synthetic

25    caffeine, correct?

93

1    A      That's correct.

2    Q      And we've talked about that a little bit before,

3    but you say that there wasn't proper labeling, "making it

4    impossible for the users of these products to detect."

5    What, if anything, did you look at or inquire into to

6    determine whether this would have mattered in any way to

7    Robin White?

8    A      To Robin White, nothing.

9    Q      Or any of the other plaintiffs that you've issued

Gerraughty depo

10    the report in.

11    A      No, I don't know who they are.

12    Q      In fact, you really haven't reviewed any plaintiff

13    specific materials?

14    A      Any what?

15    Q      Plaintiff specific materials.  For example, have

16    you reviewed the deposition of Robin White?

17    A      No.

18    Q      Do you know anything at all about Robin White?

19    A      No, other than what was mentioned in depositions.

20    Q      Do you know anything at all about any of the other

21    Ohio plaintiffs?

22    A      I don't know.  I don't think so.

23    Q      Are you going to offer any opinions as it relates

24    to these specific plaintiffs in these cases?

25    A      No, I don't expect to.

                                    94

1              MS. ABARAY:  He's going to offer general

2         opinions about manufacturing, which could then

3         relate to a specific plaintiff, but he's not

4         offering specific plaintiff testimony.

5              MR. ERNY:  All right.  I needed to find that

6         out, because of his use of the term, "making it

7         impossible for the users of these products to

8         detect."  I thought we were getting close to case

9         specific, and I just wanted to make sure that we

10        weren't.

                              Page 90

Gerraughty depo

11        MS. ABARAY:  I think he's saying users in
12        the general sense.
13  BY MR. ERNY:   (Resuming)
14    Q     Let me follow up on that.   Do you have any opinions
15    that the adding of synthetic caffeine to Metabolife 356
16    would have mattered to any individual taking the product?
17    A     That's a pretty broad question.   I do think it
18    would matter to somebody who wants all natural sources,
19    wants only to ingest things of natural sources, but I
20    don't know in the case of the plaintiffs, who was and who
21    wasn't.  I think it would make a difference to somebody
22    who doesn't want to have any synthetic things in their
23    diet.
24    Q     That's your feeling?
25    A     Yes, my opinion.

                                95

1     Q     Your opinion?
2     A     Yes.
3     Q     You also talk about, in the next section, the poor
4     control of contract manufacturers and contract
5     laboratories.   In particular, you talk about the
6     President/CEO, who is Mr. Brown, being "uninformed about
7     many practices at the contract manufacturers and Hauser
8     Laboratories."
9     A     Yes.
10    Q     What were the dates of the lab reports that you
11    reviewed.   We know, for example, the one we just looked at
12    was 1999, right?
                        Page 91

Gerraughty depo

13    A      Right.

14    Q      What general time frame were these lab reports in?

15    A      I can't give you a specific time frame, but I can

16    tell you that they should be controlling any contract

17    manufacturer or any contract laboratory that's doing work

18    for them  They begin to do it, apparently, when what's

19    his name, Jeff Brady, but Aschmoneit said they weren't

20    doing it before, and he gave no evidence of them having

21    done it before.

22    Q      When you say "they" you're referring to Metabolife

23    generically?

24    A      Yes.

25    Q      Do you know when it was that Mr. Brown became

                                    96

1    President of Metabolife?

2    A      I read it, but I don't remember.

3    Q      Do you expect the President and CEO to know all the

4    intimate details of manufacturing?

5    A      No, but I don't think this is an intimate detail.

6    I think it's an important issue.

7    Q      What detail are you talking about?

8    A      I'm talking about the fact -- what are the

9    practices at the contract manufacturer?  Does he have the

10    proper equipment to do the job?  Do they have proper

11    laboratory procedures?  Have they validated any of the

12    steps so that they can duplicate it from time to time?  Is

13    it clean?  Is it well lighted?  Are the people trained who

                                Page 92

Gerraughty depo

14      are doing the job, a lot of things.

15                     MS. ABARAY:   Before you move on, I wanted to

16             object to the form of the question, because he said

17             it wasn't a detail and you called it a detail.

18      Q       Are you telling me that you expect the President

19      and the CEO of the company to have knowledge of all of

20      that?

21      A       Yes, when they're using contract manufacturers.

22      Q       Are you telling me that in your prior consultancies

23      with, for example, pharmaceutical companies, like, for

24      example, the President and CEO of Abbott Laboratories has

25      that knowledge?

                                    97

•

1       A       Yes, he has it available to him

2       Q       That's a different issue.   Does he have that

3       knowledge?  I understand it may be available to him, but

4       you're saying in here that the President and CEO was

5       uninformed about it, and therefore, didn't have the

6       knowledge, and having it available is two different

7       things.

8                      MS. ABARAY:   Wait a minute.   You're arguing

9             with the witness.   Let's let him answer.

10      A       The product manager, also, was uninformed.

11      Q       I understand.   My questions are related to the

12      President and the CEO.   What I hear you saying now is he

13      should have this information available to him?   Do you

14      know whether Mr. Brown had this information available to

15      him?

                            Page 93

Gerraughty depo

16    A      He said he didn't.

17    Q      He said he didn't have this information available

18    to him?

19    A      He said he had never looked at this information,

20    and he said that he didn't know whether it was available

21    or not.

22    Q      And you believe that's what he testified to in his

23    deposition?

24    A      Yes.

25    Q      Is it uncommon for a President or CEO to delegate

98

1     responsibility to other employees?

2     A      Yes, it is.

3     Q      You don't have a problem with that happening?

4     A      No.

5     Q      You then say in your report that "outside

6     contractors are inspected by the contracting company who

7     should monitor these contractors frequently and

8     carefully."  What industry are you relying upon to make

9     that statement?

10    A      It's a practice in the industry.

11    Q      What industry?

12    A      In the food industry, in the drug industry, any of

13    the industries.

14    Q      On the last page of your report you provide a

15    summary, at least that's what you call it, that

16    "Metabolife International Inc. has poor control of Product

Gerraughty depo

17    356.    There are several major deficiencies in their

18    manufacturing practices that jeopardize the safety and

19    purity of this product."  Is it your testimony that the

20    product, Metabolife 356, produces and sells to the public

21    is impure?

22    A       It could be.

23    Q       And it also could not be?

24    A       Yes.

25    Q       And that it's unsafe?

99

1     A       I believe it is.

2     Q       Why is it that you believe it is unsafe?

3     A       Because they don't follow any kind of good

4     practices.  They set specifications, and they set them,

5     not FDA.  They set specifications, and then fail to meet

6     them.  Why do you need specifications if you're not going

7     to meet them.  They don't have good SOP's.  There are gaps

8     in SOP's.  There's no written SOP for how to handle

9     reworks, and several other things mentioned throughout

10    these depositions, and I don't think they are monitoring

11    contract manufacturers.  Go through the whole litany.

12    They're not doing a good job of controlling their product.

13    Q       Have you tested any product that made it to the

14    public to determine whether it's been out of spec?

15    A       No.

16    Q       To determine whether it contains lead?

17    A       Whether it what?

18    Q       Contains lead.

Page 95

Gerraughty depo

19    A    No.

20    Q    To determine whether it contains --

21          MS. ABARAY:  He hasn't tested any product.

22    Q    So you don't know if any product that actually got

23    to the public suffered from any of these problems that

24    you're talking about?

25    A    I don't know whether the products get to the public

100

or not.

1    or not.

2    Q    When you were talking about Jeff Brady, you

3    mentioned that Dr. Dash made no notes during his audits

4    and provided no written report to them?

5    A    That's what Brady said.

6    Q    Tell me what happens when the FDA comes and audits

7    your facility?

8    A    You want me to walk through what they do?

9    Q    Yes.

10    A    If they're coming in for a drug audit, let's say --

11    do you want me to do a drug audit?

12    Q    That's fine, whatever you're more comfortable with.

13    A    They'll hand the responsible individual, the

14    highest responsible individual, if the CEO was there,

15    they'd hand it to him, a 482, Notice of Inspection.

16    Q    That just means, hey, here it is, we're coming on

17    board, let us in?

18    A    Yes, that's right, and of course, they usually let

19    them in.  They get inside.  They have a team, usually.

Gerraughty depo

20    It's not just one person, but occasionally, it's one
21    person.  They have a team, and they begin an audit of the
22    plant.  How they do it varies a lot from investigator to
23    investigator, but essentially, they cover all of the same
24    things in the long run, maybe not, if they didn't do a
25    good job.  Basically, what they do is, they inspect the

101

1    plant and the records of the plant, section by section by
2    section, unless it's a limited inspection.  It could be a
3    limited inspection, just to pick up samples or something
4    of that nature.  Then, they go through the plant.
5    Usually, most investigation teams, will let management
6    know during the audit what's going on, what they're
7    finding and so forth, but they don't have to.
8    Q      How long does an audit take?
9    A      It can take anywhere from an hour, picking up a
10   sample, to weeks.  Some are very long.  It depends on the
11   size of the plant, the complexity of the plant.  Then,
12   basically, at the end, they meet with management.  They
13   let the CEO decide who he wants to sit in this exit
14   meeting, and they issue a form 483, which is a list of
15   what they observed to be deficiencies, although it's not a
16   total list.  There's a proviso on there that these may not
17   represent all of the objectionable conditions.
18   Q      Let me interrupt right there.  What happens if
19   after an FDA inspection they don't find any objectionable
20   conditions?
21   A      I would say that's very rare that they find none,

Page 97

Gerraughty depo

22    absolutely none, but if they don't, they would probably

23    say to the firm orally, you're okay, you're in essential

24    compliance with GMP's.

25    Q    So they wouldn't give you a 483 then, right?

102

1    A    They might.  They might give you a 483 which says,

2    we find these two or three things, but we consider them to

3    be minor and that the plant is in essential compliance

4    with GMP's, maybe right on the 483.

5    Q    But if they found absolutely nothing wrong,

6    hypothetically, would they issue a 483?

7    A    No, they probably wouldn't.

8    Q    Okay, go ahead.  I'm sorry.

9    A    Then, from there on, usually they leave.  The firm

10    can call the office, the central office that they worked

11    out of, whatever district it was, and they usually submit

12    a response to the 483.  If there are any items on the 483,

13    they issue a response telling their side of the issue.  At

14    the exit interview, they can ask any questions.  They can

15    say, we don't agree with you, to the investigators.  A lot

16    of things can happen, but that's essentially the process,

17    and then, of course, they may do a follow-up inspection.

18    Q    FDA might?

19    A    Might.

20    Q    Do you know if, when Dr. Dash audited the Alpine

21    Labs he found anything wrong with their procedures?

22    A    If he found anything wrong?

Gerraughty depo

23    Q      Yes.

24    A      Yes, I think he found a couple of things, but they

25    were fairly minor.

103

1    Q      What do you recall those being?

2    A      I don't recall what they were.

3    Q      If he found nothing wrong, then there wouldn't be a

4    problem with him not giving a written report, correct?

5    A      Yes, I think there would be a problem   I think

6    that if he found nothing wrong, verbally, he should give a

7    written report saying, hey, everything's okay.

8    Q      Didn't you just say that when the FDA does it, if

9    they find absolutely nothing wrong, they may not leave a

10   483?

11   A      They may not, but they will issue what they call an

12   EIR later, usually, establishment inspection report.  They

13   may discuss some of the issues and why they didn't

14   consider them to be serious and so forth.

15   Q      Is the EIR, then, provided to the company?

16   A      Not automatically, but they usually ask for it.

17   Q      You had indicated when the FDA folks come on board

18   and do their audit, I think your words were, they usually

19   find at least something at a plant?

20   A      Yes.

21   Q      It would be extremely rare not to find anything?

22   A      Yes.

23   Q      So then, you would agree that even as to

24   pharmaceutical companies, each of those would make errors?

Gerraughty depo

25      A      Each of what?

                                        104

1       Q      Each of those companies would make errors.   They

2       would be found by the FDA?

3       A       Not necessarily.   I mean, it's a spot in time, and

4       they might miss some things.   I've been in the position of

5       going in just before FDA or just after FDA and our two

6       reports found some different things than the other one

7       did.

8       Q      So it's not uncommon for there to be some

9       disagreement about what they find or whether it's really

10      applicable or whether it's really a problem?

11      A      Oh, there usually is some disagreement.

12      Q      There's nothing wrong with that.   That's pretty

13      much standard?

14      A      It's standard.

15      Q      You also talked about in Mr. Brady's deposition

16      that the FDA found that six lots of product were

17      formulated with rejected material?

18      A      Yes.

19      Q      Mr. Brady testified that actually Alpine found that

20      before the FDA did?

21      A      Yes.

22      Q      There's no evidence that that was shipped out at

23      all?

24      A      I don't know whether it was or not.

25      Q      There's no evidence that that was Metabolife 356?

Page 100

Gerraughty depo
105

•

```
 1    A      No, I don't think it was Metabolife 356.
 2    Q      Do you know if the Chemins manufacturing facilities
 3    had ever been audited by the FDA?
 4    A      I don't think they had.  I didn't see any evidence
 5    of it.
 6    Q      Have you reviewed any of the standard operation
 7    procedures for Chemins?
 8    A      For?
 9    Q      For Chemins Company?
10    A      No, only references to them in the depositions.
11    Q      And you're talking about the actual testimony in
12    the depositions?
13    A      Yes.  Some of them -- I couldn't have reviewed it,
14    because they said they didn't have one.
15            MS. ABARAY:  Just to be clear, we did ask
16            for all of the FDA inspection reports from
17            Metabolife.
18            MR. ERNY:  I understand, and I'm talking
19            about standard operating procedures, SOP's.
20    BY MR. ERNY:  (Resuming)
21    Q      Let me make sure that there's no confusion here.
22    Did you review any Chemins Company standard operating
23    procedures documents?
24    A      No, I didn't even see them
25    Q      Do you have any opinions on the manufacturing
```
106

•

Gerraughty depo

1    processes at the Chemins Company?

2    A      Yes, only from what I read in the deposition.

3    Q      Tell me about those opinions.

4    A      Basically, they would rework if they failed two

5    consecutive tests.  They did not have, according to either

6    Aschmoneit or Jeff, they didn't have a rework SOP.

7    Q      And you're referring to the Chemins Company now?

8    A      I believe I am  I think that's what he said it

9    was.

10   Q      Any other opinions about the Chemins Company?

11   A      No, except several of the lots that failed, that

12   were outside specs --

13   Q      In the documents that you reviewed?

14          MS. ABARAY:   Wait, he didn't finish his

15          sentence.

16          MR. ERNY:   I'm sorry.

17   A      Basically, they didn't catch those.  They didn't do

18   anything with those.

19   Q      The outside labs caught those?

20   A      The outside labs caught those.

21   Q      And again, you don't know whether they were shipped

22   out to the public or not?

23   A      I don't know what the final distribution was.

24   Q      I'm looking at the notes that you made of the

25   deposition of Carol Boozer, and you say in here that there

107

Gerraughty depo

1      was little in there to do with GMP's?

2      A      Yes.

3      Q      And you didn't read the entire deposition?

4      A      No, I skipped over parts of it.

5      Q      Do you believe that Mr. Brady is unqualified to do

6      the QA or QC job at Alpine?

7      A      Based on what he said in his deposition, yes, I do.

8      Q      You have a letter in your file to Ms. Abaray about

9      some previous depositions, and I assume that you've been

10     deposed on a number of occasions?

11     A      Yes, I have.  She asked me for that listing.

12     Q      I understand.  Have any of those depositions

13     involved dietary supplement manufacturers?

14     A      Can I see the thing, again.  It's been a while

15     since I wrote it.

16     Q      The letter that I'm giving you refers to only

17     depositions in the last four years.  My question is a

18     little bit more broad than that.

19     A      Yes, I've done several over the years.

20     Q      Have any of those depositions involved dietary

21     supplements?

22     A      I'm sure they did in terms of him asking me

23     questions about that portion of the company's business or

24     the company's business.

25     Q      Do you recall any of those depositions?

                                108

•

Gerraughty depo

1     A       No, it's been too long.  These didn't involve
2     dietary supplements.
3     Q       Okay.
4              MS. ABARAY:   Let the record reflect he was
5              referring to that letter when he said "these," the
6              one that's in the last four years.
7              MR. ERNY:   Just so that the record's clear,
8              he's referring to his October 17, 2002 letter.
9     BY MR. ERNY:   (Resuming)
10    Q       Attached to your CV, which is I believe Exhibit 1,
11    the last page of this, Dr. Gerraughty, has a schedule of
12    consulting fees?
13    A       Yes.
14    Q       I note in your file that there's a letter to Ms.
15    Abaray dated October 16th, indicating you're only going to
16    charge her $200 per hour or $1,600 per day, if necessary,
17    for travel days and court days?
18    A       Yes.
19    Q       So would it be accurate to say that the correct
20    statement of your schedule of consulting fees is contained
21    in this October 16th letter, as opposed to the schedule
22    that's attached to your CV?
23    A       I agreed to work for $200 an hour.
24    Q       Why the reduction in fees?
25    A       Because it's a class-action suit, and I change my
                              109

1     fees based on -- I can't charge as much to the federal
                           Page 104

Gerraughty depo

2    government in my work for them.  They have limits.  If

3    it's somebody I know, like Janet who I've worked with

4    before, I tend to give them a break.  In class-action

5    suits, I realize that you get more money than the other

6    people do, so I reduce my fee, and it's a standard

7    practice if I'm doing a class-action.

8              MS. ABARAY:  He's saying class-action in the

9         sense of mass torts.

10   BY MR. ERNY:  (Resuming)

11   Q    Do you believe that the cases that you're

12   testifying in now is a class-action?

13   A    Well, I thought it was.

14   Q    How much time have you spent on these cases?

15   A    I can't tell you the total, because my current log

16   of time -- I submitted one bill already.  That was for

17   $3,400 for 17 hours, and I've got more hours since that

18   time.  I keep a log of time, which I send to clients,

19   along with the invoice.

20   Q    Would there be any problem with providing me a copy

21   of that log of time?

22   A    I guess I could.  It's up to them.  I submitted it

23   to them.

24   Q    Would you, in addition to this list of other

25   materials that you have at home, could you supply the

110

1    first bill that you sent to Ms. Abaray and the log of your

2    time that you've kept since you sent out the first bill?

3    A    It would be handwritten up to now, is that okay?

Page 105

**Gerraughty depo**

4      Q       That's fine.  I can read your handwriting pretty

5      well.

6      A       Okay, I can't use the computer, because of eye

7      problems.

8      Q       What eye problems do you have?

9      A       I'm losing my sight.  I've almost lost it in my

10     left eye, and I'm gradually losing it in my right eye.

11     Q       Is it like macular degeneration?

12     A       I had cataracts removed, and the right eye came out

13     okay, and the left eye didn't quite do as well.

14     Q       I'm sorry to hear that.

15     A       At least I got one good one.

16     Q       Do you know how much additional time you've spent

17     in this case since you sent that first $3,400 bill?

18     A       I'd be guessing.  Is that okay?

19     Q       Give me your best guesstimate?

20     A       Okay, six or seven more hours.

21     Q       And that would involve?

22     A       I've reviewed some other materials that I didn't

23     have by the time I submitted the other bill, and I

24     reviewed some things before I came here today.

25     Q       What did you review before you came here?

                              111

1      A       I looked at a couple of the depositions that were

2      particularly key to reaching my opinions.

3      Q       To kind of refresh your recollection?

4      A       Yes, just to refresh it a little bit.

**Page 106**

Gerraughty depo

5    Q    The first bill that you sent for $3,400, did that

6    also include the time you spent reviewing Jeff Brady's

7    deposition?

8    A    I'm not sure.   You can tell from the log of time

9    when I send it.

10                    MS. ABARAY:   I don't think it did.

11                    THE DEPONENT:   I don't think it did, either,

12              but I'm not sure.

13                    MR. ERNY:   Can we take a quick break and let

14              me go over my notes?   I think we can maybe wrap

15              this up.

16                    MS. ABARAY:   Sure.

17              (Whereupon, there was a brief recess.)

18    BY MR. ERNY:   (Resuming)

19    Q    Dr. Gerraughty, other than what we've talked about

20    today with regard to your opinions in this case, and I'm

21    talking about the report that you've given us and the

22    additional opinions that you've reached after your review

23    of Jeff Brady's deposition and the review of these other

24    documents, are there any opinions that you have that we

25    haven't talked about today?

112

1    A    Not that I can recall.

2                    MR. ERNY:   I think that's all I have.   Thank

3              you.   I appreciate your time.   Do you want to

4              review and sign?

5                    MS. ABARAY:   Yes.

6                    THE DEPONENT:   What are we going to do about

Gerraughty depo

7            my folder.  Is he going to take it and get it back

8            to me?

9                  MR. ERNY:   We can go off the record.

10           (Whereupon, the deposition was concluded at

11           approximately 11:50 a.m.)

113

C E R T I F I C A T E

STATE OF ARKANSAS            )
                             )          ss
COUNTY OF WASHINGTON         )


        I, Blake Greenway, Arkansas Certified Court Reporter
Number 512, a notary public in and for the aforesaid county and
state, do hereby certify that the witness, Robert J.
Gerraughty, was duly sworn by me prior to the taking of
testimony as to the truth of the matters attested to and

Page 108

Gerraughty depo

contained therein; that the testimony of said witness was taken by me and was thereafter reduced to typewritten form by me or under my direction and supervision; that the foregoing transcript is a true and accurate record of the testimony given to the best of my understanding and ability.

I FURTHER CERTIFY that I am neither counsel for, related to, nor employed by any of the parties to the action in which this proceeding was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially interested, or otherwise, in the outcome of this action; and that I have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect impartiality, that requires me to relinquish control of an original deposition transcript or copies of the transcript before it is certified and delivered to the custodial attorney, or that requires me to provide any service not made available to all parties to the action.

Blake Greenway
Certificate Number 512

My Commission Expires:
October 25, 2005

114

Page 109